# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-CA-01096-SCT

*WILLIE JEROME MANNING a/k/a FLY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/27/2020 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT S. MINK, SR. |
| | DAVID P. VOISIN |
| | OFFICE OF POST-CONVICTION COUNSEL |
| | BY: BENJAMIN H. McGEE, III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON K. HARTMAN |
| | LADONNA C. HOLLAND |
| | BRAD A. SMITH |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | AFFIRMED - 06/30/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Willie Jerome Manning appeals, asking this Court to allow him to transfer DNA evidence gathered from the crime scene of the murders of Tiffany Miller and Jon Stecker to a different specialized lab for additional advanced DNA testing. Manning is a convicted felon on death row. After many years of pursuing options for DNA testing and fingerprint analysis of evidence used against him at trial, pursuant to Mississippi Code Section 99-39-5

(Rev. 2020), this Court partially granted Manning's request for post-conviction collateral relief (PCR). Under this Court's order, Manning proceeded in the Circuit Court of Oktibbeha County with DNA analysis and fingerprint comparison utilizing the procedures set forth in Mississippi Code Section 99-39-11 (Rev. 2020). For six years, Manning had DNA evidence tested and expert fingerprint analysis performed. After receiving allegedly inconclusive results, Manning now appeals the circuit court's order denying his motion to transfer the DNA evidence to a different facility for additional DNA testing. This Court finds the circuit court did not abuse its discretion and affirms the denial of the request for additional testing.

## FACTS AND PROCEDURAL HISTORY

¶2.     Willie Jerome Manning was convicted in 1994 of two counts of capital murder while engaged in commission of a robbery for the murders of Jon Steckler and Tiffany Miller in Oktibbeha County and was sentenced to death. *Manning v. State*, 726 So. 2d 1152 (Miss. 1998), *abrogated by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999).

### A.     Manning's Trial

¶3.     The facts surrounding Manning's crime were thoroughly detailed by this Court on direct appeal, so this Court will highlight only those relevant to the issue of DNA testing. The State's theory at trial was that Jon Steckler and Tiffany Miller, two students attending Mississippi State University, confronted Manning while he was engaged in the robbery of John Wise's vehicle in the Sigma Chi fraternity house parking lot. *Id.* at 1165. Manning held Miller and Steckler at gunpoint, forced them into Miller's car and ordered Miller to drive around. *Id.* On Pat Station Road, Manning forced Steckler out of the car and killed

2

him. *Id.* Manning and Miller drove further down the road before he subsequently killed her by shooting her in the head. *Id.*

¶4. Before trial, the Oktibbeha County Circuit Court granted Manning's motion to allow him to inspect all of the State's physical evidence, including fingerprints, hair, fiber and blood samples.

¶5. At trial, the State introduced State Evidence numbers 49 and 50, which were described as the "Bag Containing Evidence From Car." An FBI agent testified that he had analyzed State Evidence numbers 49 and 50, which were bags that contained hairs gathered from vacuuming and sweeping the carpet, console and floor of Miller's driver and passenger seat. He stated that he had performed a microscopic hair analysis and found the hairs "exhibited characteristics associated with the black race." He also testified that he could not compare the evidence to Manning's hair because he was unable to determine from which area of the body the hair fragments originated. The State frequently referenced the determination of racial characteristics of State Evidence numbers 49 and 50 in its closing arguments but stated that the hair fragments were corroborative, not dispositive, evidence.

¶6. Other evidence of guilt was presented. Statements from Paula Hathorn, Manning's live-in girlfriend,[1] were admitted into evidence, and she testified at trial. *Id.* at 1165. Hathorn stated that she saw Manning leave the house on December 9, 1992, with a gun and

---

[1]On direct appeal Manning attempted to discredit the information and evidence that Hathorn provided to the police. These attempts included discrediting her as a witness and informant and claiming she was used by the prosecution to show Manning was a "criminal and a generally evil person." *Id.* at 1171. This Court found no error in allowing Hathorn's testimony related to Manning's guilt. *Id.* at 1172.

gloves. *Id.* Manning returned on December 14, 1992, with a CD player, a leather jacket and a watch, but he no longer had the gun. *Id.* Hathorn gave the police the leather jacket, and John Wise identified it as the one stolen from his car. *Id.* Hathorn also testified that Manning used the trees behind his mother's house for target practice, and she had seen him shooting in early December 1992. *Id.* Bullet shell casings were found in the trees at Manning's mother's house that matched the bullets found at the crime scene and in Miller's body.[2] *Manning*, 726 So. 2d at 1166. John Wise identified a restroom coin that was stolen from his car and found at the crime scene. *Id.* One of Manning's friends pawned a CD player that Manning had sold to him, which had a matching serial number to the one stolen from John Wise. *Id.* Another one of Manning's friends testified that Manning attempted to sell her a gold class ring and wristwatch that matched the description of items belonging to Jon Steckler. A silver huggie that matched the description of the one stolen from John Wise was found in a fire hydrant approximately five miles from Manning's residence. *Manning*, 726 So. 2d at 1166. Frank Parker, an inmate incarcerated at the same time as Manning, stated that he had heard Manning talking to another inmate about how Manning "didn't think

---

[2]A letter from the United States Department of Justice was sent to the office of the district attorney of Okitbbeha County on May 6, 2013, advising it that error had occurred at Manning's trial when the FBI firearm examiner testified that the bullets found at the crime scene and the bullets found in the tree were fired from the same firearm "to the exclusion of all other firearm[s] in the world." Supplement to Motion to Stay Execution and Set Aside Convictions, Second Motion for Leave to File Successive Petition for Post-Conviction Relief, and Motion in the Alternative for Other Forms of Relief at 6, *Manning v. State*, 119 So. 3d 293 (Miss. 2013) (No. 2013-DR-00491-SCT) (mem.). As to Manning's second PCR, this Court had denied Manning's request for a hearing on the reliability of the ballistics analysis expert testimony. Order, *Manning v. State*, No. 2013-DR-00491-SCT (Miss. Apr. 25, 2013).

they could convict him of the crime" and that he had sold the gun on the street. ***Id.*** In May 1993, while Manning was incarcerated, he confessed to Earl Jordan, his cousin, that he murdered the two students. ***Id.*** Jordan's statement of Manning's confession was also introduced as State evidence, and Jordan testified at trial.[3] ***Id.***

¶7.     Manning's conviction and sentence were affirmed on direct appeal by this Court. ***Id.*** at 1198. The Supreme Court of the United States denied Manning's petition for writ of certiorari. ***Manning v. Mississippi***, 526 U.S. 1056, 119 S. Ct. 1368, 143 L. Ed. 2d 528, (1999).

### B.     Manning's First PCR

¶8.     In Manning's first petition for PCR he "raise[d] numerous claims. The majority of those claims relate[d] to the State's failure to disclose evidence and claims of ineffective assistance of council." ***Manning v. State***, 929 So. 2d 885, 890 (Miss. 2006). Manning also filed a motion during the course of his first PCR to allow him leave for discovery and inspection of evidence. Petition for Review of Lower Court's Order Denying Motion for Expert Assistance, Discovery, and Inspection of Evidence, ***Manning v. State***, 929 So. 2d 885 (Miss. 2006) (No. 2001-DR-00230-SCT). This Court denied Manning's motions and

---

[3]In Manning's first petition for PCR he argued that he was entitled to a new trial because at trial the State questioned Jordan on his willingness to take a polygraph test. This Court denied Manning's PCR and refused to retroactively apply the holding of ***Weatherspoon***, 732 So. 2d 158. Instead, this Court applied the holding in ***Conner v. State***, which was precedent at the time of the trial. ***Conner v. State***, 632 So. 2d 1239 (Miss. 1993) *overruled by* ***Weatherspoon***, 732 So. 2d at 162. In Manning's second petition for PCR, he asserts that Jordan recanted his trial testimony. This Court denied PCR relief on this claim because Manning failed to "present any competent evidence." Order, ***Manning v. State***, No. 2013-DR-00491-SCT (Miss. Apr. 25, 2013).

denied Manning's first petition for PCR. *Manning*, 929 So. 2d at 907.

### C. Manning's Federal Case

¶9. In 2008, Manning began pursuing a capital habeas corpus relief action in the United States District Court for the Northern District of Mississippi asking for the "(1) production of evidence and funds for DNA testing; (2) the appointment of experts; and (3) subpoena of records that are in the possession of the Department of Human Services." *Manning v. Epps*, No. 1:05CV256-P, 2008 WL 4516386, at *1 (N.D. Miss. 2008). The district court granted Manning "leave to inspect the physical evidence in the custody of the Oktibbeha County Sheriff's Department, and [Manning] received a certified copy of the reports from the Mississippi Crime Lab in connection with this case." *Id.* at *1. Manning discovered untested biological evidence from the rape kit, victims' hands, fingernail scrapings, and vacuum sweepings of the car. *Id.* However, Manning's request for DNA testing in federal court was denied because he "failed to establish that DNA testing of the fingernail scrapings and the hair found in the victims' hands [was] reasonably necessary to pursue the claims in his petition, nor [was] there a basis for the Court to authorize inspection of the sexual assault kit performed on Miller." *Id.* at *2. There was "no nexus between the services sought and a claim of constitutional dimension." *Id.* The court further stated that "[e]ven if DNA testing could conclusively prove that it was not Petitioner's hair that was found in the vehicle, those results would not impeach the testimony given at trial, must less exonerate Petitioner." *Id.*

6

### D. Manning's Second PCR

¶10. On March 22, 2013, this Court initially denied Manning's motion for leave to file a successive petition for post-conviction relief that included a request for DNA testing and other forensic analysis. Order, *Manning v. State*, No. 2013-DR-00491-SCT (Miss. Apr. 25, 2013). But this Court subsequently granted Manning leave to proceed in Oktibbeha County Circuit Court with DNA analysis and fingerprint comparison pursuant to the procedures set forth in Mississippi Code Section 99-39-11.[4] Order, *Manning v. State*, No. 2013-DR-00491-SCT (Miss. July 25, 2013).

¶11. Manning was allowed sixty days from the date of issuance of this Court's mandate to file his petition for DNA testing and fingerprint analysis in the Oktibbeha County Circuit Court. The mandate issued on August 15, 2013, and Manning timely filed a petition on October 14, 2013, requesting that the circuit court assist him in locating biological evidence

---

[4] Prior to this Court's granting Manning's successive petition for PCR, the United States Department of Justice sent a letter stating

> the microscopic hair comparison analysis testimony or laboratory report presented in this case included statements that exceeded the limits of science and was, therefore, invalid. While this case did not involve a positive association of an evidentiary hair to an individual, the examiner stated or implied in a general explanation of microscopic hair comparison analysis that a questioned hair could be associated with a specific individual to the exclusion of all others - this type of testimony exceeded the limits of the science.

Motion to Stay Execution and Set Aside Convictions, Second Motion for Leave to File Successive Petition for Post-Conviction Relief and Motion in the Alternative for Other Forms of Relief at 13, *Manning v. State*, 119 So. 3d 293 (Miss. 2013) (No. 2013-DR-00491-SCT) (mem.). The letter also offered FBI services for mitochondrial DNA or STR testing of the relevant hairs or related biological evidence. *Id.* This Court denied Manning a hearing on this issue but granted him leave to proceed with the DNA testing.

7

suitable for DNA testing and permit him to send the evidence to Bode Technologies for analysis and comparison with DNA profiles in the Combined DNA Index System (CODIS) and State DNA Index System (SDIS) databases. In his petition, Manning noted that "[d]epending on the condition of the evidence and the amount and type of biological material determined by the laboratory to be present after it had performed an initial screening of the evidence," a variety of modern DNA testing methods, such as "STR DNA testing, Y-STR DNA testing, mitochondrial DNA testing or mini-STR DNA testing" could be used to test the evidence. If the State objected to Bode Technologies, Manning offered in his petition that Orchid Cellmark was an acceptable alternative laboratory to perform the testing. In addition, he requested to be permitted to retain an expert to perform fingerprint analysis comparisons with prints in the AFIS or IAFIS databases and those lifted from the crime scene. Manning's counsel attached more than four hundred pages of affidavits and documents to the petition that strongly supported their claim that DNA profiles could be obtained from the evidence. An affidavit from Bode Technologies was attached and stated that its lab technicians had reviewed the case and felt that items from the crime scene evidence had a "reasonable probability of providing probative DNA evidence in this case." Additionally, an affidavit from Orchid Cellmark was attached and stated that its lab technicians had reviewed the case and found that testing of the evidence at Orchid Cellmark could "potentially provide probative, if not dispositive, evidence as to Mr. Manning's guilt or innocence." The State responded to Manning's petition and requested that Manning's counsel furnish a detailed list of items to be tested. The State argued in reply that the

8

evidence should be sent to Orchid Cellmark because it was concerned about a potential "relationship [Manning's] anonymous 'donor' who is going to pay for this testing might have with Bode Technologies."

¶12.   On January 31, 2014, the circuit court held a status conference and subsequently entered an order granting the parties thirty days to submit an agreed order for "the evidence to be tested, by what laboratories or agencies, how the evidence is to be shipped, by whom shipped, during what time period and to whom and when the results are to be delivered."  On March 6, 2014, the circuit court entered an Order Directing Search for Evidence for seven different facilities.

### a.   Testing At Orchid Cellmark

¶13.   On August 29, 2014, the circuit court entered an agreed order to send the discovered evidence to Orchid.  The circuit court also attached an exhibit that listed all items that would be sent to Orchid for DNA testing such as extracts from the rape kit, Tiffany Miller's clothing, hairs from both victims hands, hair and fiber from Miller's car, fingernail scrapings, John Steckler's clothing and items found in or around Miller's car.  After completion of the testing, the parties could submit another agreed order for more testing at Orchid.

¶14.   During the following months, the parties began the DNA testing at Orchid and agreed to a fingerprint analyst.  By November 24, 2014, Orchid received the biological evidence and recommended that it begin testing on the following items: three swabs from the rape kit, fingernail scrapings from both victims, pubic combings, items of Miller's clothing, hair found in both victims' hands and debris from clothing.  In the first round of testing, Orchid

9

would focus on finding DNA on the items. If no DNA profiles were discovered, Orchid would test additional items. If Orchid was able to find DNA from the specimen, it would recommend further testing. On June 5, 2015, the circuit court entered an Agreed Order for Delivery of Fingerprint Evidence and Protocol For Fingerprint Analysis.

¶15. On June 8, 2015, Orchid sent a status update on the initial DNA screening and testing. One of the three swabs from the rape kit came back positive for semen, two were inconclusive and all three were negative for sperm. The sample from the pubic combing was negative for sperm and inconclusive for semen. The lab halted testing on the pubic hair sample because it was negative for both sperm and semen. Fingernail scrapings from Miller's right hand and Steckler's left hand contained concentrations of human DNA. The hairs found in Miller's right hand and Steckler's left hand were marked as missing from their evidence containers. Orchid recommended further testing on the pubic combing, three swabs from the rape kit and all extracts from the fingernail scraping to determine if a male DNA profile was present.

¶16. On July 23, 2015, the circuit court entered an agreed order to proceed with the additional testing recommended by Orchid and ordered that the victim's blood samples be delivered to the lab for DNA comparison. Around this time, Orchid merged with Bode Technologies, the lab Manning initially desired to do the testing.

### b. Testing At Bode Cellmark

¶17. All of Manning's evidence was transferred to a Bode facility in Lofton, Virginia. On August 10, 2015, the circuit court entered an agreed order to send Manning's tissue samples to Bode for comparison of DNA profiles. On January 8, 2016, Bode sent correspondence to Manning's counsel recommending further testing on the following specimen: hair from the ceiling of the car, hair from Miller's right hand and vacuum sweeping hair and debris from the car.

¶18. On January 19, 2016, the results of the fingerprint analysis from the Mississippi Forensics Laboratory were returned to the court and revealed "no suitable candidate for further comparisons [were] found in the AFIS or IAFIS databases." This concluded fingerprint analysis as neither party requested any further action.

¶19. From January 19, 2016, until January 4, 2019, the record contains very little proof as to what occurred. The Supreme Court Clerk sent many requests to be updated on the progress of the case. Manning's counsel claims that, during this time, they were communicating with Bode as to the details of pricing and funding of the testing for certain pieces of evidence. It is unclear from the record if during this time Bode was actively testing DNA or if the previously approved additional testing at Orchid ever occurred. On January 4, 2019, the circuit court entered an order setting a status conference.

¶20. On January 14, 2019, the circuit court held a status conference and ordered the parties to submit a second scheduling order setting final dates for the conclusion of DNA testing. The agreed scheduling order was entered on February 11, 2019. It authorized two rounds of

11

DNA testing. The lab would first screen the evidence for DNA and then do a final testing or comparison of the hair. After receiving the results from the second round of DNA testing, the parties would decide if other items of evidence submitted to Bode needed additional screening. The parties would have thirty days to file additional motions.

¶21. On February 20, 2019, Bode sent a case report on its testing progress. It had completed some testing on an additional fifteen samples, including: hair from the ceiling of the car, hair from Miller's right hand, vacuum sweeping and debris from the car and hair from Jon Steckler's left hand. The lab found that most of the evidence included more than a single hair fragment. The hairs introduced into evidence at trial were designated by Bode as Q44 and Q43, which included hair samples E7, E8, E13 and E14. Results from testing samples E7 and E8 were reported in the February 2019 report. Sample E7 was found to contain "four apparent human hairs that are not suitable for nuclear DNA analysis but may be suitable for mitochondrial DNA analysis." Sample E8 contained "seven apparent human hairs that are not suitable for nuclear DNA analysis but may be suitable for [mt]DNA analysis." Additionally, sample E8 contained "one apparent hair that was reported as undetermined origin due to an inability to visualize the morphological characteristics;" however, it might be suitable for mtDNA analysis. All four of the E7 hairs and eight of the E8 hairs were subjected to mtDNA analysis but "[n]o mtDNA data was obtained." The hairs found in the victim's hands were previously reported by Orchid to be missing from their evidence; however, after Orchid merged with Bode, they were listed as available for testing. The hairs found in Steckler's hands were twenty strands of apparently human hairs that were

suitable for mtDNA analysis. Five of the hairs from Steckler's hands were processed, and of the five, one produced a full mtDNA profile, three produced a partial mtDNA profile and one did not produce a reportable mtDNA profile. There was a partial mtDNA profile gathered from the one hair found in Miller's hand. On the final page of the report, the analysis of the mtDNA profiles was attached. Forensic Biology Conclusions were listed for all the other hairs and debris from the vacuum sweeping of the car, and results showed that most of them were unsuitable for nuclear DNA analysis but may have been suitable for mtDNA analysis. However, they were not further processed.

¶22. Per correspondence with the Supreme Court Clerk, on March 13, 2019, counsel for Manning stated that the lab received approval to begin testing on the following five additional hairs: (1) hair from ceiling of car, (2) hair root end from vacuum sweeping, (3) hair shaft from vacuum sweeping, (4) a Q43 sample labeled E13 and described as long light brown straight hair from vacuuming passenger side of car and (5) a Q44 sample labeled E14 and described as long brown wavy hair from vacuuming driver seat. As previously stated, the Q43 and Q44 samples are the hairs that were introduced as evidence at trial.

¶23. From March 2019 through July 2019 the parties discussed how to proceed with testing in spite of the possible consumption of hair samples during testing. On July 13, 2019, the lab was authorized to proceed with the testing so long as it preserved the genetic extract of the hairs to return it to the proper custodian after testing.

¶24. On October 23, 2019, Bode sent a supplemental case report of its results from the testing of the additional five hairs. No mtDNA was obtained from the hair from the ceiling

13

of the car, hair shaft from vacuum sweeping or the Q44 sample E14 long brown wavy hair from vacuuming driver seat. Mitochondrial DNA test results from the Q43 sample E13 long light brown straight hair from vacuuming passenger side of car was unreportable due to the "discord between amplifications." The hair root end from vacuum sweeping the car was suitable for nuclear DNA analysis and upon further screening the presence of human DNA was found to be below the limit of detection.

¶25. On December 2, 2019, Manning's counsel requested additional time to identify other items of evidence to be screened for DNA. The State opposed the motion for an extension of time, and the circuit court set a hearing for January 31, 2020, to resolve the issue.

¶26. On January 28, 2020, Manning's counsel filed a Motion to Allow Transfer of Evidence for Conclusion of DNA Testing. Manning stated the reason for the request to transfer was because "Bode recommended Petitioner send these items of evidence to another lab where different methods of testing are used," and "Bode identified MitoTyping Technologies, LLC, as a laboratory specializing in isolating and identifying DNA in older and smaller hair samples using methods that are not employed by Bode." Attached to the petition was an affidavit from an employee at MitoTying Technologies and the February 2019 and October 2019 DNA testing reports from Bode. The State opposed the motion. Counsel for Manning filed a Reply in Support of Petitioner's Motion to Allow Transfer of Evidence For Conclusion of DNA Testing, arguing that additional testing could be completed in three to four months and this would be the final attempt to obtain DNA for comparison to crime scene evidence. Manning's counsel also stated in their reply that on January 13, 2020,

14

they had instructed Bode to compare the reference samples to profiles Bode had obtained from its testing.

¶27.	The circuit court stated the following in its order:

> On February 11, 2019, following a status conference on January 10, 2019, a second scheduling order was entered to facilitate the conclusion of testing. Since that order, Bode, the testing facility selected by the Petitioner, has produced two reports that have been reviewed by both parties and the Court. Both reports show that the testing did not produce results from the DNA that the Petitioner selected to be tested. Now, almost a year later, with many deviations from the timeframe established in the second scheduling order, and almost six years since the first scheduling order concerning testing, the Court is asked to determine if Manning should be allowed to transfer seven hair samples to a different facility for further DNA testing.

> 	. . . .

> 	So the burden is on the Petitioner to convince the court that there are reasonable grounds to suspect that there is DNA evidence to be obtained from these samples and that the evidence could be exculpatory. In the current case, the Petitioner argues that the samples should be transferred to a secondary facility, MitoTyping Technologies, but nothing the Petitioner presented shows a reasonable likelihood that MitoTyping would be able to provide results that Bode could not. The movant must show how a different testing method would produce more probative results than the method originally used to overcome the procedural bar. *Green v. State*, 242 So. 3d 176, 179 (Miss. Ct. App. 2017). MitoTyping may be able to provide an "ancient DNA approach" with a success rate of 95%, but there still has been no showing as to why they would succeed in obtaining mtDNA where Bode has failed to do so.

> 	Further, if the Petitioner was able to show that additional testing would provide a reasonable likelihood of more probative results, he would still have to show a reasonable probability that he would not have been convicted or would have received a lesser sentence if this testing had been obtained at the time of the original prosecution. The Petitioner argues that the DNA evidence is relevant because the State's closing argument at trial discussed DNA results and that may have influenced the jury. The Court finds this argument to be without merit. Closing arguments are not evidence. If this motion was granted, the samples were tested, and mitochondrial DNA was found in all seven samples, there would be no outcome relevant to the case. The vacuum

15

sweeping could have come from any source from the time the car was manufactured until the time the samples were obtained. Identifying the mitochondrial DNA of seven hair samples obtained from vacuum sweeping and debris from the car will not call into question the Petitioner's conviction as it is irrelevant to the issue of guilt.

The Court finds that there is not a reasonable likelihood of probative results with a transfer or that a transfer would result in new evidence. Without this showing, it would be outside the scope of case law to permit the transfer of evidence at this stage in the proceedings. Considering all of these factors, the Court denies Petitioner's Motion to Allow Transfer of Evidence for Conclusion of DNA Testing.

¶28. Manning now appeals the denial of his motion to transfer the evidence and asks this Court to allow him to obtain additional testing at MitoTyping Technologies.

## ISSUES PRESENTED

¶29. The parties have listed various issues in this case. This Court finds that they are best stated as follows:

I. Whether the circuit court lacked the authority to decide Manning's motion to transfer evidence for additional testing.

II. Whether the circuit court abused its discretion by denying Manning's motion to transfer evidence for additional testing.

    i. Whether the circuit court applied the incorrect statute and the incorrect standard.

    ii. Whether the circuit court abused its discretion by denying Manning's motion when evaluated under the proper statute.

        1. Did the circuit court abuse its discretion by denying additional testing pursuant to Mississippi Code Section 99-39-11(9)(d)?

        2. Did the circuit court abuse its discretion by denying additional testing pursuant to

16

Mississippi Code Section 99-39-11(10)?

3.       Has Manning raised any other issues that prove the circuit court abused its discretion by denying additional testing?

**STANDARD OF REVIEW**

¶30.   Pursuant to Mississippi Code Section 99-39-23(7) (Rev. 2020), at all times, the burden was on Manning to prove by a preponderance of the evidence that he was entitled to relief. This Court has established that the standard of review for denial of a motion for post-conviction relief is that "this Court will not disturb the factual findings of a trial court in denying the petition unless such findings were clearly erroneous." ***Rowland v. State***, 42 So. 3d 503, 506 (Miss. 2010) (citing ***Moore v. State***, 986 So. 2d 928, 932 (Miss. 2008)). However, this case is not a review of a trial court's denial of a petition for post-conviction relief. Instead, this Court is asked to review the circuit court's denial of additional testing within the procedures of a previously granted right to proceed with a petition for post-conviction relief. The circuit court was given discretion, according to the statutory language, to grant or deny additional testing. Therefore these issues will be reviewed under an abuse of discretion standard.[5] Finally, "where questions of law are raised the applicable standard of review is de novo." ***Lambert v. State***, 941 So. 2d 804, 807 (Miss. 2006) (internal

---

[5] It is noted that other states have applied an abuse of discretion standard of review for an appeal of a trial court's decision to grant or deny additional DNA testing in a petition for post-conviction relief. *See* ***Smith v. Commonwealth***, No. 2007-CA-000143-MR, 2008 WL 2312630, at *2 (Ky. Ct. App. June 8, 2008); ***Isom v. State***, 372 S.W.3d 809, 813 (Ark. 2010); ***State v. Prade***, 9 N.E.3d 1072, 1078 (Ohio 2014); ***Overton v. State***, 976 So. 2d 536, 548-49 (Fla. 2007); ***State v. Newhall***, No. 1 CA-CR 13-0349 PRPC, 2014 WL 5877924, at *1 (Ariz. Ct. App. 2014).

quotation mark omitted) (quoting ***Brown v. State***, 731 So. 2d 595, 598 (Miss. 1999)).

## DISCUSSION

### I.    The circuit court had the authority to decide Manning's motion to transfer evidence for additional testing.

¶31.    The State argues that the circuit court did not have the authority to decide Manning's motion to transfer the evidence for additional testing. This Court finds that Manning's motion was correctly decided before the circuit court as it was not a new petition for post-conviction relief.

¶32.    Statutes must be read according to their intended purpose. This Court "will not engage in statutory interpretation if a statute is plain and unambiguous." ***Lewis v. Hinds Cnty. Cir. Ct.***, 158 So. 3d 1117, 1120 (Miss. 2015) (internal quotation marks omitted) (quoting ***Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid***, 21 So. 3d 600, 607 (Miss. 2009), *abrogated by* ***King v. Mississippi Military Department***, 245 So. 3d 404, 407 (Miss. 2018)). "Whether the statute is ambiguous, or not, the ultimate goal of this Court in interpreting a statute is to discern and give effect to the legislative intent." ***City of Natchez, Miss. v. Sullivan***, 612 So. 2d 1087, 1089 (Miss. 1992) (citing ***Anderson v. Lambert***, 494 So. 2d 370, 372 (Miss. 1986)).

¶33.    Pursuant to Mississippi Code Section 99-39-5, this Court granted Manning's motion to proceed in the circuit court with DNA testing and fingerprint comparison according to the procedure set forth in Mississippi Code Section 99-39-11. Section 99-39-11 states in relevant part that "[t]he court, in its discretion, may make such other orders as may be appropriate in connection with a granting of testing under subsection (3). These include . .

18

. . (d) Additional DNA testing, if the results of the initial testing are inconclusive or otherwise merit additional scientific analysis." Miss. Code Ann. § 99-39-11(9)(d) (Rev. 2020). This section further states that:

> The court may order additional testing . . . upon a showing by the petitioner that the comparisons of a DNA profile derived from the biological evidence at the scene of the crime for which he was convicted could . . . provide evidence that raises a reasonable probability that the trier of fact would have come to a different outcome by virtue of that comparison demonstrating the possible guilt of a third party or parties.

Miss. Code. Ann. § 99-39-11(10) (Rev. 2020). Once the petition to proceed in the Oktibbeha County Circuit Court was granted by the Supreme Court, the circuit court judge possessed authority to order additional DNA testing under Section 99-39-11. Additionally, the only direction given to the circuit court in this Court's order was to proceed under Section 99-39-11.

¶34. The State cites *Knox v. State* to support its argument that Manning had to first obtain an order from the Supreme Court to direct the filing of the motion to transfer the evidence for additional testing. *Knox v. State*, 75 So. 3d 1030, 1037 (Miss. 2011). In *Knox* a group of "inmates requested that the chancery court enjoin the State from opposing the filing of a successive petition for post-conviction relief in each inmate's case, from requesting execution dates for any of them, and from opposing a stay of execution in any case involving one of the inmates." *Id.* at 1032. The chancery court dismissed the claims, and this Court affirmed the dismissal because the chancery court lacked jurisdiction over the claims under the Uniform Post-Conviction Collateral Relief Act (UPCCRA). *Id. Knox* is distinguishable because Manning had already filed a petition for PCR relief with this Court. Manning did

19

not have to re-petition this Court to request additional testing because the authority to grant or deny additional testing is included in Section 99-39-11.

¶35. The State also argues that Manning's motion is a new PCR request because it was filed six years after this Court's order authorizing testing that, in the State's opinion, has already been completed. The State notes that it "could find no case instructive on this matter" but argues that the plain language of the statute shows that the court did not have authority to decide Manning's motion. This Court finds the plain language of the statute grants authority to the circuit court to fully oversee the DNA testing and fingerprint analysis and to order additional testing if the petitioner meets his required burden. *See* Miss. Code Ann. § 99-39-11. While such a delay can be considered by the trial court in addressing the merits of the request, neither the statutes nor this Court's order indicates any limitation as to the time or the scope of the allowable testing.

¶36. This Court finds that the circuit court had the authority to decide Manning's motion to transfer the evidence.

## II. The circuit court did not abuse its discretion by denying Manning's motion to transfer evidence for additional testing.

¶37. Manning argues that the circuit court clearly erred when it determined the ultimate relevance of testing prematurely, contravening its own prior findings and the order of this Court to allow testing. If the circuit court had the authority to decide the motion, then the circuit court necessarily had the authority to decide the ultimate relevance of the testing. The language of the statute required the circuit court to make a conclusion as to the "merit of additional scientific analysis" when considering additional testing of evidence. § 99-39-

20

11(9)(d). In addition, the circuit court could have granted additional testing if the circuit court had found there was a "reasonable probability that the trier of fact would have come to a different outcome" if the DNA profiles derived from the crime scene evidence, when compared to DNA profiles in the SDIS or CODIS database, demonstrated the possible guilt of a third party. Miss. Code Ann. § 99-39-11(10). The circuit court could not have decided the motion for additional testing without also making a decision as to the probative value of the testing. This Court finds that the circuit court did not err by deciding the ultimate relevance of additional testing.

### i. The circuit court cited an incorrect statute but applied the correct standard.

¶38. As a preliminary matter, although the circuit court possessed the authority to decide Manning's motion, it cited the wrong statute. "[H]owever, a long-standing rule of this Court is that we will not reverse a lower court's decision where that court reaches the right conclusion although for the wrong reason." *Briggs v. Benjamin*, 467 So. 2d 932, 934 (Miss. 1985) (citing *Huffman v. Griffin*, 337 So. 2d 715 (Miss. 1976); *Tex. Gas Transmission Corp. v. City of Greenville*, 242 So. 2d 686 (Miss. 1970); *Yazoo & Miss. Valley R.R. Co. v. Adams*, 81 Miss. 90, 32 So. 937 (1902)). This includes citing the wrong statute. The circuit court denied Manning's motion to transfer citing Mississippi Code Section 99-39-5(1)(f) and Mississippi Code Section 99-39-5(2)(a)(ii), which set forth the burden for being allowed to initially proceed with DNA testing through the PCR process. Section 99-39-5(1)(f) states:

> (1) Any person sentenced by a court of record of the State of Mississippi, including a person currently incarcerated, civilly committed, on parole or probation or subject to sex offender registration for the period of the

registration or for the first five (5) years of the registration, whichever is the shorter period, may file a motion to vacate, set aside or correct the judgement or sentence, a motion to request forensic DNA testing of biological evidence or a motion for an out-of-time appeal if the person claims: . . . (f) That there exists biological evidence secured in relation to the investigation or prosecution attendant to the petitioner's conviction not tested, or, if previously tested, that can be subjected to additional DNA testing, that would provide a reasonable likelihood of more probative results, and that testing would demonstrate by reasonable probability that the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such forensic DNA testing at the time of the original prosecution.

Miss. Code Ann. § 99-39-5(1)(f) (Rev. 2020). Section 99-39-5(2)(a)(ii) (Rev 2020), similarly, says:

(2) A motion for relief under this article shall be made within three (3) years after the time in which the petitioner's direct appeal is ruled upon by the Supreme Court of Mississippi or, in case no appeal is taken, within three (3) years after entry of the judgment of conviction. Excepted from this three-year statute of limitations are those cases in which the petitioner can demonstrate either: . . . (ii)That, even if the petitioner pled guilty or nolo contendere, or confessed or admitted to the crime, there exists biological evidence not tested, or, if previously tested, that can be subjected to additional DNA testing that would provide a reasonable likelihood of more probative results, and that testing would demonstrate by reasonable probability that the petitioner would not have been convicted or would have received a lesser sentence if favorable results had been obtained through such forensic DNA testing at the time of the original prosecution.

Miss. Code Ann. § 99-39-5(2)(a)(ii) (Rev. 2020). Section 99-39-5 was inapplicable to the circuit court's decision to grant or deny Manning's motion because Manning had already been granted the right to proceed with DNA testing. Per this Court's order, the circuit court was to oversee the DNA testing according to the procedures set forth in Section 99-39-11. Because Manning's motion was within the framework of the already granted right to proceed with DNA testing, it should have been decided under Section 99-39-11(9)(d) or Section 99-

39-11(10), both of which provide the basis for the grant of additional testing. Section 99-39-11(9)(d) states:

> (9) The court, in its discretion, may make such other orders as may be appropriate in connection with a granting of testing under subsection (3). These include, but are not limited to, designating: . . . (d) Additional DNA testing, if the results of the initial testing are inconclusive or otherwise merit additional scientific analysis;

Miss. Code Ann. § 99-39-11(9)(d) (Rev. 2020). Additional testing may also be granted under Section 99-39-11(10), which states:

> (10) The court may order additional testing, paid for in accordance with subsection (6) and (8), upon a showing by the petitioner that the comparison of a DNA profile derived from the biological evidence at the scene of the crime for which he was convicted could, when compared to the DNA profiles in the SDIS or CODIS database systems, provide evidence that raises a reasonable probability that the trier of fact would have come to a different outcome by virtue of that comparison demonstrating the possible guilt of a third party or parties.

Miss. Code Ann. § 99-39-11(10) (Rev. 2020).

¶39. While the circuit court cited an incorrect statute, it applied the correct standard. The standards in Section 99-39-11 and Section 99-39-5 are similar in that they required Manning to show the relevance that probative results from DNA testing would have on his conviction. Nevertheless, the circuit court's holding is supported under the discretionary standards set forth in Section 99-39-11. The circuit court stated in its order that "the burden is on the Petitioner to show that there are reasonable grounds to suspect that there is DNA evidence to be obtained from these samples and that the evidence could be exculpatory." The circuit court further addressed the correct standard by requiring Manning to "show that additional testing would provide a reasonable likelihood of more probative results" and "that he would

23

not have been convicted or would have received a lesser sentence if this testing had been obtained at the time of the original prosecution."

¶40.    *Green v. State* has been heavily referenced throughout the record. *Green v. State*, 242 So. 3d 176, 178 (Miss. Ct. App. 2017). In *Green*, a petitioner, whose conviction and sentence had never been affirmed by this Court on direct appeal, requested additional DNA testing in his first PCR motion filed in the circuit court in Jackson County. *Id.* at 178. The circuit court determined that the petitioner's claims were "time-barred and lacked merit." *Id.* The petitioner appealed. *Id.* The Court of Appeals applied Section 99-39-5(2)(a)(ii) and found that the petitioner failed to "show how a different testing method would produce more probative results than the method originally used." *Id.*

¶41.    *Green* has limited applicability to the case at hand. *Green* applied Section 99-39-5(2)(a)(ii). As previously mentioned, the circuit court also cited Section 99-39-5 in ruling on Manning's motion and relied partially on *Green*, when the proper statute was Section 99-39-11. The facts, however, support the circuit court judge's ruling under either. For example, Section 99-39-5, and the holding in *Green*, require a showing that "a different testing method would produce more probative results." *Green*, 242 So. 3d at 179. If Manning had made that showing, he would have proved the probative nature of additional testing and therefore would have satisfied the Section 99-39-11(9)(d) requirement that he prove that the evidence merited additional scientific analysis. The circuit court did not abuse its discretion, despite citing the wrong statute and applying the holding in *Green*, because the record reflects that the circuit court applied the appropriate standards in reviewing Manning's

24

claim.

### ii. The circuit court did not abuse its discretion by denying Manning's motion when evaluated under the proper statute.

¶42.    Although the circuit court cited an incorrect statute, the circuit court did not abuse its discretion by denying Manning's motion.

¶43.    According to the requirements of Section 99-39-11, Manning had to convince the circuit court that additional testing was necessary due to the fact that the evidence was inconclusive or otherwise merited additional analysis or separately demonstrate a reasonable probability of possible guilt of a third party by virtue of DNA comparison. Manning failed to meet either standard.

### 1. The circuit court did not abuse its discretion by denying additional testing pursuant to Section 99-39-11(9)(d).

¶44.    Pursuant to Section 99-39-11(9)(d), the circuit court, "in its discretion, may make such other orders as may be appropriate in connection with a granting of testing under subsection (3). These include, but are not limited to, designating: . . . (d) Additional DNA testing, if the results of the initial testing are inconclusive or otherwise merit additional scientific analysis[.]"

¶45.    It was in the court's discretion to grant additional testing if the results were inconclusive. The circuit court allowed Manning three rounds of testing: one at Orchid and two at Bode.  After almost six years of testing, the circuit court stated that Bode delivered two reports that "show that the testing did not produce results from the DNA that the

Petitioner selected to be tested." The circuit court did not abuse its discretion by making this determination. The reports regarding the mtDNA testing show the discovery of one full mtDNA profile and four partial mtDNA profiles. In fifteen hairs, no mtDNA was obtained, and in two hairs, the results were unreportable due to discordance between amplifications. Importantly, no mtDNA was obtained from the Q43 and Q44 hair samples used as evidence at trial. Manning argues that "results obtained so far about the hair DNA provides no information about the source, and therefore it is 'inconclusive' within the meaning of Miss. Code Ann. § 99-39-11(9)(d)." The State argues that the "results are not inconclusive. Manning just did not get the results he wanted and seeks more testing." This Court recognizes that the source of the hair is yet to be determined and agrees that the results are arguably inconclusive.

¶46.    However, merely because the results were inconclusive does not mean that the evidence should be subjected to additional testing. Section 99-39-11(9) gives the circuit court judge discretion to grant additional testing in light of inconclusive results. The circuit court judge recognized that no results were produced and nevertheless denied additional testing. The circuit court did not abuse its discretion by making this finding as he found no reasonable likelihood that further testing would produce probative results.

¶47.    No case law exists in this jurisdiction to guide this Court in its application of Section 99-39-11(9)(d). However, a case from the Supreme Court of Arkansas is persuasive.

¶48.    In *Pitts v. State*, Pitts was convicted of capital murder and kidnaping. *Pitts v. State*, 2011 Ark. 322, at *1 (2011). Similar to the case at hand, an FBI agent had testified at Pitts's

trial that he had performed microscopic analysis on a hair found on the victim's clothes and that it was "'microscopically' similar to [the] appellant's hair." *Id.* at *2. This method of microscopic analysis had been discredited, and Pitts requested, in a writ of habeas corpus, that the evidence be retested. *Id.* His request was granted, and the Arkansas State Crime Lab (ASCL) performed a nuclear DNA test, but no DNA profile was produced. *Id.* In addition, the ASCL found another hair root that was "possibly suitable for mitochondrial DNA testing," but it did not have the capability to perform the testing. *Id.* Subsequently, the hairs were lost. *Id.* at *3. Years later, Pitts filed a second petition for writ of habeas corpus "alleging actual innocence and citing his inability to have further testing, specifically mitochondrial DNA testing, performed on the missing Q13A hair fragment." *Id.* The circuit court found that the DNA test results were inconclusive but that Pitts was not entitled to any further relief. *Id.* Pitts appealed. *Id.* The Supreme Court of Arkansas held the circuit court's ruling was not clearly erroneous because the statutory language to grant or deny additional testing placed the decision within the discretion of the circuit court. *Id.*

¶49. Although Pitts had to overcome the additional hurdle of the lost hair samples, the holding as to the circuit court's discretion is applicable here. The statutory language controlling in the *Pitts* case stated that "[i]f the deoxyribonucleic acid (DNA) test results obtained under this subchapter are *inconclusive*, the court may order additional testing or deny further relief to the person who requested the testing." *Id.* at *5 (alteration in original) (emphasis added) (quoting Ark. Code Ann. § 16-122-208(b)). This is similar to the language in Section 99-39-11(9)(d) (emphasis added) that states "[t]he court, in its discretion, may

27

make such other orders as may be appropriate in connection with a granting of testing" such as ordering "[a]dditional DNA testing, if the results of the initial testing are *inconclusive* or otherwise merit additional scientific analysis." The Arkansas courts found the results in *Pitts* to be inconclusive because no DNA profile was discovered. *Pitts*, 2011 Ark. at *5.

¶50. The State argues that Manning's results are not inconclusive. Pursuant to the reasoning in *Pitts*, the results from Bode's DNA testing would not be inconclusive because a DNA profile was discovered on one of the hair samples, and analysis was performed with the one full and four partial mtDNA profiles. Manning's counsel claims in January 2020 they instructed Bode to compare the reference DNA samples of Manning and the victims to DNA profiles which Bode had obtained from its testing in February 2019. The results of this comparison are not discussed by either party; however, these statements indicate there has been delay in comparison since the discovery of the profiles. Regardless of whether or not Manning has purposefully delayed the discovery of conclusive results, the circuit court had discretion to deny additional testing. However, Manning's results remain inconclusive because the source of the hair remains unknown and the results of a DNA profile comparison are not in the record. Just as in *Pitts* "under the statute the circuit court had discretion to order either additional testing or deny further relief." *Pitts*, 2011 Ark. at *5. Although the evidence in Manning's case has not been lost as in *Pitts*, the level of deference that the Arkansas Supreme Court gave to the Arkansas circuit court's denying additional testing is applicable and persuasive here and is supported by the evidence. It was within the Oktibbeha County Circuit Court's discretion, pursuant to Section 99-39-11, to grant or deny additional

28

testing. The circuit court denied the request, finding no reasonable probability that additional results would have been obtained.

¶51. As to the necessity of additional scientific analysis, Manning further argues that MitoTyping will succeed in finding a DNA profile from the hair evidence because it has more advanced testing methods than Bode. Manning attached an affidavit from a MitoTyping lab technician to his Motion to Allow Transfer of Evidence For Conclusion of DNA Testing. The affidavit stated that MitoTyping Technologies has provided forensic mtDNA analysis since 1999 and that "[t]he laboratory has published peer-reviewed articles in [the area of mtDNA analysis], showing that hairs less than 0.5 cm can successfully be typed for mtDNA over 90% of the time." The affidavit further discussed the mtDNA testing procedures and mentioned their more advanced testing method of "ancient DNA approach" that can amplify small fragments of DNA and piece the information together. The affidavit also included a statement from the lab technician that "[d]espite our best efforts, there still exists the chance that the sample may be too highly degraded to yield a result." In email correspondence with the parties, a MitoTyping forensic examiner encouraged Manning to submit the evidence for testing, but also stated MitoTyping cannot "guaranty [sic] results or provide a probability of achieving results for [this] specific case."

¶52. Despite the MitoTyping lab technician's inability to provide a probability of success in recovering DNA in this specific case, Manning argues that there is 90 percent chance MitoTyping will discover a full DNA profile from the evidence. Manning bases this success rate on the statistics given in the affidavit from the MitoTyping lab technician. Manning

29

argues that Bode has a success rate of 22 percent because Bode has produced mtDNA data on five out of twenty three hair samples. Manning argues that this demonstrates that "Bode was unable to detect mitochondrial DNA in 78% of the hairs most recently tested." Manning contrasts the MitoTyping's general rate of success for typing hairs less than 0.5 cm in length with Bode's specific rate of success in testing hairs of various lengths from evidence in this case in an attempt to show a reasonable likelihood that probative DNA evidence will be obtained from the samples. This comparison is inaccurate. Manning's counsel calculated a success rate by using Bode's results from testing hairs of various lengths in this case. The MitoTyping general success rate for hairs less than 0.5 cm cannot accurately be compared to Bode's success rate for testing hairs greater than or less than 0.5 cm in this specific case. Manning has not shown that MitoTyping's general rate of success will apply in this case as to these samples. The State argues that Bode's "success rate in typing mtDNA in *this* case may have been 22%, [but] its success rate is not 22% in all cases. Claiming that MitoTyping Technologies has a success rate of 90% and Cellmark/Bode has a success rate of 22% is a misrepresentation." Additionally, MitoTyping stated in its email correspondence that "the ability to successfully type a hair sample will be impacted by the integrity of [the] sample itself." Bode characterizes these hair samples to be small and notes the possibly that the DNA has degraded. Manning characterizes the samples as "too small or too degraded" for Bode to study, yet he does not show that MitoTyping will be able to overcome these issues to achieve results in this specific case. Additionally, the State argues that Manning has not presented any evidence that Bode Cellmark recommended that sending these samples to

30

MitoTyping. Other than Manning's statements in the record, the State is correct. There is no evidence in the record that Bode has recommended Manning send these samples to an allegedly more advanced lab.

¶53. Manning has failed to present an accurate analysis that would support a reasonable probability that a DNA profile would be obtained from the samples. Because Manning failed to show that DNA evidence would be obtained, the circuit court denied the motion for additional testing and determined that "there is not a reasonable likelihood of probative results with a transfer." In other words, Manning has not met his burden. It was in the circuit court's discretion, according to Section 99-39-11(9)(d), to make the determination as to whether the evidence merited additional scientific analysis. The circuit court did not abuse its discretion by denying Manning's motion because Manning failed to introduce any reliable evidence as to why the allegedly inconclusive results merited additional scientific analysis or proof that the additional testing would produce results. Manning simply argues that MitoTyping is a better lab than the labs that he chose, but he does not show why the lab would succeed in obtaining mtDNA after Bode failed to do so. This Court affirms the circuit court's denial of the request for additional testing under Section 99-39-11(9)(d) because the circuit court did not find the evidence merited further scientific analysis.

> **2. The circuit court did not abuse its discretion by denying additional testing pursuant to Section 99-39-11(10).**

¶54. Section 99-39-11(10) allows the court to order additional testing if

> the comparison of a DNA profile derived from the biological evidence at the scene of the crime for which he was convicted could, when compared to the

31

> DNA profiles in the SDIS or CODIS database systems, provide evidence that raises a reasonable probability that the trier of fact would have come to a different outcome by virtue of that comparison demonstrating the possible guilt of a third party or parties.

Miss. Code Ann. § 99-39-11(10) (Rev. 2020). Section 99-39-11(10) requires Manning to "provide evidence that raises a reasonable probability that the trier of fact would have come to a different outcome" by demonstrating the possible guilt of a third party through DNA profile comparison. Manning has failed to meet the standard under Section 99-39-11(10). Manning's states that one of his reasons for requesting additional testing is to "obtain a full profile that matches the profile of an individual whose DNA data is included in available databases." Other than general statements, Manning does not provide any additional evidence or claims of a third party's involvement in the crime.[6]

¶55. No cases in this jurisdiction have interpreted the additional testing language in Section 99-39-11(10), so we review other jurisdiction's case law interpreting similar statutes.

¶56. The United States Court of Appeals for the District of Columbia Circuit evaluated similar issues in *Hood v. United States*, 28 A.3d 553 (D.C. Cir. 2011). Charles Hood assaulted an elderly woman, and she subsequently died from her injuries. *Id.* at 556. He was found guilty of first-degree felony murder and related offenses. *Id.* His conviction and sentence were affirmed on direct appeal. *Id.* at 557. After years of imprisonment, Hood filed

---

[6]Earl Jordan's statement of Manning's confession mentions that Manning and Jesse Lawrence "were burglarizing a car at Mississippi State when they saw the two students. Manning pulled a gun on them and forced them into the car. According to the version Manning gave Jordan, Lawrence told Manning to get rid of the students." *Manning*, 726 So. 2d at 1166. "Lawrence was incarcerated on the night of the murders in Prichard, Alabama." *Id.* No other reference to Lawrence or another third party's involvement has been made, and Manning did not argue any specific person was involved in the crime.

a pro se motion to vacate his conviction and sentence, and the "trial court construed the motion as raising a claim for relief under the then recently enacted Innocence Protection Act of 2001 (IPA)[.]" *Id.* Hood was granted DNA testing of a knife and of his clothing recovered by the police. *Id.* at 555. The test results were inconclusive; the lab was unable to obtain DNA profiles from the samples because they were "highly degraded." *Id.* at 558 (internal quotation mark omitted).

¶57. After receiving the DNA report, Hood filed a supplemental motion for additional DNA testing, arguing that

> skin cells, though too small to be seen by the naked eye, still might be present and might have recoverable DNA from which a profile could be obtained—a profile that would demonstrate he was not the person who assaulted [the victim] and, perhaps, enable the authorities to identify the actual culprit.

*Id.* Pursuant to District of Columbia Code Section 22-4133(d), Hood was required to satisfy a two-prong test. First, Hood had to show that the evidence met the statutory definition of "biological evidence." *Hood*, 28 A.3d at 558. Second, Hood had to show that "there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent of the crime for which the applicant was convicted[.]" *Id.* (alteration in original) (internal quotation mark omitted) (quoting D.C. Code § 22-4133(d)). Hood failed to satisfy the second prong of the test. *Id.* The District of Columbia Circuit stated that "the IPA evidently requires an applicant for post-conviction DNA testing to make a comparable showing and demonstrate something more than a mere possibility that the test results would help him prove his actual innocence in spite of all the evidence of his guilt." *Id.* at 564. The court held that even if a DNA profile of someone

33

other than the appellant or the victim was discovered, Hood failed to show a reasonable probability that would help him establish his actual innocence. *Id.* at 565-66. Hood had never introduced evidence that another person was present during the attack or was a "possible perpetrator whose link to the crime could be corroborated through DNA testing[.]" *Id.* at 565. The court also evaluated that if in a hypothetical scenario a third person's skin cells were found, "the presence of third-party skin cells on these objects might mean someone other than appellant or [the victim] touched them *at some point in time*; but that proves nothing, because it would not mean that the cells were deposited on the items during or around the time of the attack." *Id.* at 565. The court affirmed the superior court's finding and held that "the discovery of a stranger's DNA in trace skin cells would do exceedingly little, if anything, to rebut the overwhelming evidence of appellant's guilt." *Id.* at 566.

¶58.    The court's analysis in *Hood* is instructive to this Court's review of the issues in this case. Although the statutory language differs, the court in *Hood* evaluated if the defendant had shown the possible guilt of a third party in order to merit additional DNA testing of evidence. *See id.* at 565. Similar to *Hood*, Manning has not presented evidence that could link another possible suspect to the crime nor has he shown that DNA testing will prove a third party's involvement. Interestingly, Manning does not claim that additional DNA testing will not further incriminate him; he states that "it remains to be seen whether the DNA in the listed samples incriminates Manning or not." The District of Columbia Circuit in *Hood* stated that "the presence of third-party skin cells on these objects might mean someone other than appellant or [the victim] touched them at some point in time; but that proves nothing[.]"

*Id.* at 565. The holding of the Oktibbeha County Circuit Court was similar in stating that "vacuum sweeping could have come from any source from the time the car was manufactured until the time the samples were obtained. Identifying mitochondrial DNA of seven hair samples obtained from the vacuum sweeping and debris from the car will not call into question the Petitioner's conviction[.]" Although not binding authority to this Court, the court's reasoning in *Hood* is persuasive.

¶59.    Another instructive case is *Prible v. State*, 245 S.W.3d 466 (Tex. Crim. App. 2008). Prible was convicted of capital murder and his conviction and sentence were affirmed on appeal. *Id.* at 467. "Appellant filed a motion for DNA testing under Texas Code of Criminal Procedure Chapter 64, which was denied by the trial court" because Prible had "failed to show by a preponderance of the evidence that he would not have been convicted if exculpatory DNA results were obtained." *Id.* Prible appealed. *Id.* The Texas Code of Criminal Procedure required Prible to show that "unaltered evidence is available for testing, identity was an issue in the case; that there is greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results; and that the request is not to delay the execution of the sentence" in order to grant his request for DNA testing. *Id.* at 467-68. The court stated that "[i]f, regardless of the results, retesting would not show by a preponderance of the evidence that Appellant would not have been convicted then there is no reason for the court to order the DNA testing." *Id.* at 469-70. The court held that

> [e]vidence of another person's DNA in addition to Appellant's is not exculpatory evidence in this case due to the additional evidence presented at trial. Thus, even if the evidence was retested and determined to contain another person's DNA in addition to Appellant's DNA, it would not establish

35

by a preponderance of the evidence that Appellant would not have been convicted if the jury had heard that DNA from a third-party was present.

*Id.* at 470 (footnote omitted). For those reasons, the Court of Criminal Appeals of Texas affirmed the Texas trial court's holding to deny DNA testing. *Id.*

¶60. The analysis of the Court of Criminal Appeals of Texas is helpful to this Court's review of the Oktibbeha County Circuit Court's decision to deny additional testing. Texas's criminal-procedure rule language applicable in *Prible* is similar to the requirements of Section 99-39-11(10) in that it requires a showing that the trier of fact would have come to a different outcome based on the possible results of additional DNA testing. The Texas court's reasoning that "[e]vidence of another person's DNA in addition to Appellant's is not exculpatory evidence in this case due to the additional evidence presented at trial" applies here. *Prible*, 245 S.W.3d at 470. Were Manning granted additional DNA testing and another person's DNA profile was found, it would not exonerate Manning. Due to the additional evidence presented at trial it would not even establish, without more, a showing that the outcome would have been different. This Court summarized the additional evidence in its first denial of Manning's successive request for PCR in the following statement:

> Manning's conviction and sentence were based on substantially more evidence than he now challenges or is referenced in the objections to this order. Our examination anew of the record reveals that conclusive, overwhelming evidence of guilt was presented to the jury.
>
> *Inter alia*, three items were stolen from burglary victim John Wise's car (parked in the same lot as Tiffany Miller's (murder victim) car that night) – a CD player, a leather jacket and a unique bathroom token. In addition, Steckler's watch and class ring were missing. A witness who had known Manning for years testified that, within a week of the murders, Manning showed up at her house and wanted to sell her a watch and ring matching the

36

exemplars. An electronic store owner identified Manning as the man who attempted to pawn the CD player and a separate witness testified that he actually purchased the CD player from Manning. The witness later pawned it in Jackson. It was recovered and matched by serial number as Wise's. The token taken from Wise's car was recovered at the murder scene.

Manning's live-in girlfriend testified that she last saw Manning before the murders leaving the house with a handgun and gloves. He returned to the house a few days after the murders, *sans* handgun and gloves, but with a CD player, a watch and a leather jacket, *inter alia*. She testified that Manning wore the leather jacket until a deputy sheriff came to the house, after which, he gave the leather jacket to her. She later turned over Wise's jacket to authorities. She further testified that, just days before the murders, she observed Manning firing a handgun into a tree behind the house in which they lived. . . .[7]

Moreover, Manning's cousin, Earl Jordan, testified that Manning told him that he and another had killed "the two students out [there] at Mississippi State." Jordan testified that Manning told him that they were on campus breaking into a car when the two victims walked up on them. Manning pulled a gun and forced them into the victim's car. Manning told Jordan that he was the one who shot the victims. Regarding this testimony, this Court stated, "Manning's confession to Jordan removed this case from the circumstantial realm . . . ." [*Manning*, 726 So. 2d at 1194]. Coupled with Jordan's testimony, the jury heard from a cell mate of Manning's, Frank Parker, that Manning had stated that he did not believe that he could be convicted and that he "sold the gun on the street."

Finally, in reference to Justice King's concern regarding hair fragments, the State argued in closing that it is only "corroborative . . . not dispositive evidence." The defense elicited testimony that other African Americans had been seen in Miller's car before her murder. In closing, defense counsel made it clear "there was no physical evidence that put Manning at the scene." The State offered no evidence claiming the hair fragments found at the crime scene were a match for Manning. The absence of Manning's DNA does not preclude his participation in the crimes charged.

Order, *Manning v. State*, No. 2013-DR-00491-SCT, at *2-4 (Miss. April 25, 2013).

---

[7] This Court's reference to the FBI testimony of the ballistic evidence has been omitted from this quote since that evidence was found to be questionable after receiving letters from the United States Department of Justice.

¶61. Manning has failed to show that a full DNA profile, if gained from additional testing, would have raised a reasonable probability that the trier of fact would have come to a different outcome. The Oktibbeha County Circuit Court held that if "samples were tested, and mitochondrial DNA was found in all seven samples, there would be no outcome relevant to the case." This Court finds that the discovery of a DNA profile from the hair samples would be relevant to this case. If all the DNA testing samples resulted in a positive match to Manning's DNA profile, it would not change Manning's conviction, but it would be relevant. However, the circuit court did not abuse its discretion by making this statement because even if every single hair matched to a specific DNA profile in the CODIS database, Manning would still have to overcome the other evidence and testimonies that convinced the jury of his guilt. The State argues that "[t]he presence of another person's hair at the crime scene would not prove Manning was not there—only that another person's hair was in the vehicle." Manning argues that he is "seeking information that determines whether he can be excluded as the source of DNA contained in the hairs admitted into evidence against him." Manning does not argue that his DNA would not be found in the testing results; he argues only that he is trying to remedy an "absence of results." Manning's statement of his intention to show a third party was involved in the crime without presenting additional proof as to the involvement of a third party is insufficient to satisfy the burden required to grant additional testing under Section 99-39-11(10).

¶62. Manning has been able to test the evidence of his choice at the lab of his choice. He has had the evidence tested at both Bode and Orchid due to the fact that they merged during

the course of his DNA testing. Although the State initially requested that Manning submit a list of the items of evidence he wished to have tested, nothing in the record shows that the State objected to Manning's choice of hair samples for each round of testing. Additionally, Manning has had multiple rounds of additional testing at Bode. The circuit court denied Manning leave to transfer the evidence for additional testing at MitoTyping because he failed to convince the court that "there is a reasonable likelihood of probative results with a transfer or that a transfer would result in new evidence[,]" and Manning failed to satisfy the statutory requirements of Section 99-39-11. Specifically, Manning failed to convince the court that the evidence, inconclusive or otherwise, merited additional scientific analysis, pursuant to Section 99-39-11(9), or that by virtue of a DNA comparison with the SDIS or CODIS databases and the evidence from the crime scene, a reasonable probability existed that the trier of fact would have come to a different outcome by virtue of the comparison demonstrating the possible guilt of a third party, pursuant to Section 99-39-11(10). Further, fingerprint analysis results did not yield any suitable matches. Testing of the rape kit showed all three swabs negative for sperm, and only one tested positive for semen. Results from the additional testing of the fingernail scrapings, rape kit and pubic combing were never submitted to the court. Mitochondrial DNA testing produced one mtDNA profile, four partial mtDNA profiles and other hairs produced unreportable or undetectable results. Manning tested State's Evidence numbers 49 and 50, Bode samples Q44 and Q43; although no mtDNA was discovered on those samples, the results are not inconsistent with the trial testimony from the FBI agent regarding his microscopic findings of the racial characteristics

39

of the hair. Although a full DNA profile was discovered from the testing of one of the hair samples, the results remain inconclusive because they did not pinpoint the source of the hairs. The circuit court had discretion to grant or deny Manning's request for additional testing. If additional testing had been granted and another individual's DNA profile was discovered from the crime scene evidence, no proof has been shown that it would change the outcome of Manning's case. Manning has presented no evidence that additional DNA testing is needed to prove who murdered Jon Steckler and Tiffany Miller.

¶63. For these reasons, the circuit court did not abuse its discretion by denying additional testing.

### 3. Manning's remaining arguments are without merit.

¶64. Manning argues that no prejudice would be caused by allowing additional testing. Manning further argues that "[i]n the absence of such prejudice there is no good reason to refuse the testing." The issue of prejudice is not the legal standard. It was in the circuit court's discretion to determine if additional testing was necessary pursuant to Section 99-39-11. Section 99-39-11 set forth the grounds for which additional testing could be allowed. Manning failed to satisfy any of the statutory requirements. Manning's argument that no prejudice will occur is not relevant, and his argument that he should be granted additional testing merely because of a lack of prejudice is without merit.

¶65. Both parties argue that time is significant to the issues in this case. The State argues that Manning should be denied additional testing because he has had six years to complete DNA testing. Manning argues that the circuit court erred by concluding there were

deviations from the scheduling order. Extensive time has been granted for Manning to complete the DNA testing and fingerprint analysis. The Oktibbeha County Circuit Court stated that there had been "many deviations from the time frame established in the second scheduling order" and that it had been "almost six years since the first scheduling order concerning testing." Significant time is unaccounted for from January 2016 to January 2019. The record evidences that delays arose because Manning was picking hair samples for testing and working to find funding. The second scheduling order was agreed to and entered on February 11, 2019. However, testing was delayed from March 27, 2019, to July 12, 2019, for the parties to discuss the possible consumption of hair samples during testing. After this delay, testing resumed until Manning asked for an extension of time to evaluate which samples should be subjected to additional testing. Both parties have asked for continuances and additional time on separate occasions. However, no time frame or scope for the testing was considered when this Court granted Manning leave to proceed with testing under Section 99-39-11. The circuit court did not use time frames to form the basis of its opinion to deny additional testing. The circuit court stated the decision to deny additional testing was due to the absence of "a reasonable likelihood of probative results with a transfer or that a transfer would results in new evidence" and due to Manning's failure to meet his burden that "there is DNA evidence to be obtained from these samples and that the evidence would be exculpatory." The circuit court did not abuse its discretion by addressing the delays.

¶66.    Manning argues that his right to due process will be violated if the Court does not allow him to transfer the evidence for additional testing. Manning cites *District Attorney's*

*Office for the Third Judicial District v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009) as his authority to raise a due process claim from denial of DNA testing. In *Osborne*, a convicted felon, claimed a post-conviction due process right under 42 U.S.C. § 1983 to DNA testing of state evidence used against him at trial. *Id.* at 61. The United States Supreme Court refused to extend due process rights to include DNA testing of state evidence because it would "take the development of rules and procedures in this area out of the hands of legislature and state courts shaping policy in a focused manner and turn it over to the federal courts applying the broad parameters of the Due Process Clause." *Id.* at 56. Applying the holding in *Osborne* to the case at hand, this Court finds no merit in Manning's argument that denying him additional testing will violate his right to due process. He has been allowed extensive testing.

¶67. Manning has pursued DNA testing and fingerprint analysis on many occasions prior to this Court's granting of his request. Before Manning's trial in 1994, a motion was granted that allowed him to inspect, examine and test all the physical evidence in possession of the State. *See* Order, *Manning v. State*, No. 2013-DR-00491-SCT (Miss. Apr. 25, 2013). After trial and during the course of Manning's first PCR, Manning filed a motion to allow him leave for discovery and inspection of evidence. Petition for Review of Lower Court's Order Denying Motion for Expert Assistance, Discovery, and Inspection of Evidence, *Manning*, 929 So. 2d 885. This Court denied Manning's discovery motions. Manning again pursued testing of DNA evidence in his request for federal habeas corpus relief. *Manning*, 2008 WL 4516386, at *1 (N.D. Miss. 2008). The federal court granted Manning leave to inspect the

Oktibbeha County Sheriff's Department evidence and obtain evidence records from the Mississippi Crime Lab. *Id.* However, the federal court denied Manning leave for testing of the evidence. *Id.* at *2. Manning then filed his successive motion for PCR requesting DNA analysis and fingerprint comparison, which gave rise to the issues presented in this appeal. As Chief Justice Randolph stated in his objection to granting Manning's Motion to Stay Execution, Manning "should not be allowed to take a gambler's risk and complain if the cards [fall] the wrong way." *Manning v. State*, 112 So. 3d 1082, 1083-84 (Randolph, P.J., objecting to the order with separate written statement) (alteration in original) (internal quotation mark omitted) (quoting *Osborne*, 557 U.S. at 86 (Alito, J., concurring)).

## CONCLUSION

¶68.    This Court finds that the circuit court did not abuse its discretion by denying Manning's request to transfer evidence for additional testing because Manning did not meet his burden pursuant to Section 99-39-11.  This Court affirms the circuit court's decision.

¶69.    **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.  KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶70.    In cases involving the penalty of death, a heightened scrutiny applies on appeal. *Hansen v. State*, 592 So. 2d 114, 142 (Miss. 1991). "Translated, what becomes harmless error in a case with less at stake may become reversible error when the penalty is death, . . . as procedural niceties give way to the search for substantial justice, all because death

43

undeniably is different." *Id.* (citing *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)).

¶71.    In 1994, Willie Jerome Manning was convicted of the murders of Jon Steckler and Tiffany Miller and was sentenced to death. During Manning's trial, Federal Bureau of Investigation Special Agent Chester Blythe, who was qualified as an expert in the field of hair and fiber analysis, stated that he had examined debris that was collected from the driver's side and the passenger's side of Miller's car and testified as follows:

> Uh, in these two specimens that I have, uh, labeled Q-43 and Q-44, uh, there were hairs located in there. By examining these hairs I noted certain racial characteristics, that is, I can—I can examine hair and separate it into three major racial categories as, uh, hairs from individuals of the black race, uh, hairs from mongoloids; they are American Indians, Eskimos, uh, and orientals, and hairs from caucasians. These hairs from different racial groups exhibit different characteristics. I was able to determine that hairs that were found in these specimens exhibited characteristics associated with the black race. . . .
>
> Well using these certain characteristics that are associated with the various races, I was able to determine these hairs were hairs from an individual of the black race. The hairs were hair fragments and I couldn't identify the area of the body from which the[y] came so they're unsuitable for comparison with the known hair sample. So the limit of my abilities at this point in time was just to associate these hairs or determine that these hairs came from an individual of the black race.

During closing arguments, the prosecutor capitalized on Blythe's testimony and argued

> From there, ladies and gentlemen, the set [of possible suspects] gets smaller because you see, we know that the burglar was in fact [their] executioner, but we haven't yet identified who the burglar was. How do you do that? Well first of all, ladies and gentlemen, out of all the people that could have been a burglar of John Wise's car, how many of them could leave hair fragments in the car, hair fragments that came from a member of the African-American race because that's what they find when they vacuum the sweepings of the car; that's what they find in both significantly the passenger's seat and the driver's seat, just like it would be if the man rode out there as a passenger and came back as a driver. They were insufficient for any more comparison; all they could say is that's what they were, but that narrows the field some.

The prosecutor continued to refer to those hair fragments throughout his closing argument, using the hair fragments repeatedly as a way to implicate Manning because he was a member of the African-American race.

¶72. In 2013, the Mississippi Supreme Court granted Manning leave to proceed in the Oktibbeha County Circuit Court with his request for DNA analysis and fingerprint comparison. In 2014, the circuit court entered an agreed order for delivery of evidence to Orchid Cellmark Forensic DNA Testing Facility, a forensic laboratory, for DNA testing. Orchid Cellmark began testing certain items in evidence that it deemed most likely to yield probative results.

¶73. In October 2015, Orchid Cellmark announced that it was merging with Bode Technology and that all of the evidence in Manning's case would be transported to a Bode facility. In January 2016, Bode recommended that it screen each item in evidence that had not been tested yet. Because of the high cost associated with testing each hair, Manning selected certain items in evidence to be tested further, including the hairs contained in Q43 and Q44, which were used against Manning at trial. However, due to the age of the evidence, the degradation of tissue, and the limited size of the samples, Bode was unable to obtain data regarding the presence of mitochondrial DNA in most of the items, including twelve hair fragments contained in Q43 and Q44. Adrienne Barranco, a DNA analyst with Bode, stated that the testing indicated that "there is not enough [mtDNA] present for us to detect it with our current testing methods."

¶74. However, Bode identified MitoTyping Technologies, LLC, as a laboratory

specializing in isolating and identifying DNA in older and smaller hair samples using methods that Bode did not employ. Manning filed a motion to allow transfer of evidence for conclusion of DNA testing in which he requested permission to direct Bode to deliver seven hair samples, including samples contained in Q43 and Q44, to MitoTyping Technologies for final testing.

¶75.    Gloria J. Dimick, a forensic examiner for MitoTyping Technologies, submitted an affidavit stating that "[m]itochondrial DNA analysis is very useful on small hairs and the laboratory has a great deal of experience in handling of small old hairs from cold cases. The laboratory has published peer-reviewed articles in this area, showing that hairs less than 0.5 cm can successfully be typed for mtDNA over 90% of the time." Dimick additionally stated that "[t]he oldest casework hair successfully typed at MitoTyping Technologies was from 1969. The smallest hair successfully typed was 2 mm in length." Dimick concluded that "[e]mploying an 'ancient DNA approach' for testing forensic casework samples is unique to Mitotyping Technologies." Dimick explained that an 'ancient DNA approach' is used when standard processing fails, and the laboratory amplifies very small fragments of DNA to piece information together.

¶76.    Dimick also stated that it was not uncommon for MitoTyping Technologies to receive items for mitochondrial DNA analysis that had been attempted at other facilities. Further, Dimick stated that the laboratory's overall success rate is "~95% for all hairs regardless of age or length." Bode represented that the items of evidence could be packaged and delivered to MitoTyping Technologies in a matter of days. Additionally, counsel for Manning stated

46

that testing at MitoTyping Technologies would take approximately three to four months from the receipt of the evidence.

¶77.   Under Mississippi Code Section 99-39-11(9)(d),

> The court, in its discretion, may make such other orders as may be appropriate in connection with a granting of testing under subsection (3). These include, but are not limited to, designating:
>
> . . . .
>
> (d) Additional DNA testing, if the results of the initial testing are inconclusive or otherwise merit additional scientific analysis[.]

Miss. Code Ann. § 99-39-11(9)(d) (Rev. 2020). Further, Section 99-39-11(10) states that

> The court may order additional testing, paid for in accordance with subsections (6) through (8), upon a showing by the petitioner that the comparison of a DNA profile derived from the biological evidence at the scene of the crime for which he was convicted could, when compared to the DNA profiles in the SDIS or CODIS database systems, provide evidence that raises a reasonable probability that the trier of fact would have come to a different outcome by virtue of that comparison demonstrating the possible guilt of a third party or parties.

Miss. Code Ann. § 99-39-11(10) (Rev. 2020).

¶78.   The majority states that it was within the trial court's discretion to grant or deny additional testing and that the "circuit court denied the request, finding no reasonable probability that additional results would have been obtained." Maj. Op. ¶ 50. I would find that the circuit court abused its discretion. MitoTyping Technologies has stated that it employs a methodology that is unique to its laboratories and that it has an extremely high success rate in typing small hairs. Further, Bode identified MitoTyping Technologies as specializing in isolating and identifying DNA in older and smaller hair samples using

47

methods that Bode did not employ.

¶79. Importantly, if MitoTyping Technologies is able to develop a DNA profile, that DNA profile has the possibility of revealing the identity of the true perpetrator and of exonerating Manning. For example, in ***Ruffin v. State***, Larry Ruffin was convicted of the brutal rape and murder of Eva Patterson. ***Ruffin v. State***, 447 So. 2d 113, 114-15 (Miss. 1984). This Court stated that "[h]er gown and bedspread contained hairs of Negroid origin." ***Id.*** at 115. Ruffin, an African-American man, twice made written confessions to raping and murdering Patterson and even described how he had gained entrance to Patterson's residence and had left the residence. ***Id.*** He died in prison in 2002. Innocence Project New Orleans, Larry Ruffin, https://ip-no.org/what-we-do/free-innocent-prisoners/client-profiles/larry-ruffin/ (last visited June 15, 2022). Two other men also pleaded guilty to the crime and testified at Ruffin's trial in exchange for life sentences. ***Id.*** However, in 2010 and 2011, Ruffin and his co-defendants "were exonerated by DNA testing on semen recovered from the victim's body." ***Bivens v. Forrest Cnty.***, No. 2:13-CV-8-KS-MTP, 2015 WL 1457529, at *3 (S.D. Miss. Mar. 30, 2015).

¶80. Thus, in a case that appeared to contain overwhelming evidence of guilt, especially in light of Ruffin's and his codefendants' confessions, the absence of DNA in Ruffin's case likely would have been insufficient to prove his innocence. Yet the presence of the true perpetrator's DNA conclusively established his and his codefendants' innocence. Similarly, in ***Brewer v. State***, Kennedy Brewer was convicted for the rape and murder of a three-year-old. ***Brewer v. State***, 725 So. 2d 106, 112 (Miss. 1998). Brewer had been home alone with

the child while her mother had gone out with friends. *Id.* There were no signs of forced entry into the house. *Id.* at 114. In addition, dog-sniff evidence, forensic evidence, and incriminating statements from Brewer were introduced into evidence at trial. *Id.* at 114-16.

¶81.    Nine years after the murder, forensic evidence was tested and excluded Brewer as a possible perpetrator of the crime. Innocence Project, Kennedy Brewer, https://innocenceproject.org/cases/kennedy-brewer/ (last visited June 15, 2022). Brewer was exonerated. *Id.* The evidence later matched one of the original suspects in the crime. *Id.* Again, considering the evidence submitted at trial, the absence of DNA in Brewer's case likely would not have proved his innocence. However, testing of the DNA led to the true perpetrator of the crime. *Id.*

¶82.    In another case out of Louisiana, Gene Bibbins was convicted of the rape of thirteen-year-old Kenya Canty and of burglary. *Bibbins v. City of Baton Rouge*, 489 F. Supp. 2d 562, 565 (M.D. La. 2007). After Kenya was raped, the perpetrator "picked up a large Sony cassette radio with a broken handle and exited through the window." *Id.* Less than an hour later, a police officer "saw Bibbins walking on a nearby street while carrying a cassette radio with a broken handle." *Id.* at 566. Bibbins was arrested and an officer "filed a police report which stated that Canty's description of the rapist matched Bibbins in every way except for the fact that Canty advised that the rapist was wearing blue jeans." *Id.* at 567. Additionally, the State presented evidence at trial that semen samples taken from the scene of the crime were those of a "B secretor" and that blood samples taken from Bibbins showed that he also was a "B secretor." *Id.* "Apparently, only 6.4 percent of the population at the time were 'B

49

secretors.'" *Id.* Canty also identified Bibbins as her attacker. *Id.* However, as the Louisiana district court stated, "[u]nfortunately for Bibbins . . . was the fact that the jury convicted an innocent man." *Id.* Bibbins was exonerated by DNA testing after more than fifteen years in prison. Innocence Project, Gene Bibbins, http://innocenceproject.org/cases/gene-bibbins/ (last visited June 15, 2022).

¶83. "There is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) (citing *Furman v. Georgia*, 408 U.S. 238, 286-91, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972)). "When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed." *Id.* (citing *Powell v. Alabama*, 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932)). This Court applies a heightened scrutiny in cases involving sentences of death because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Walker v. State*, 913 So. 2d 198, 2216 (Miss. 2005) (internal quotation marks omitted) (quoting *Hansen*, 592 So. 2d at 142). Therefore, I strongly disagree with the trial court's contention that "[i]f this motion was granted, the samples were tested, and mitochondrial DNA was found in all seven samples, there would be no outcome relevant to the case." This Court has already found that Manning had satisfied his burden to obtain DNA testing. And the above-referenced cases clearly show that DNA testing could potentially lead to the true perpetrator of the crime, even when strong circumstantial evidence and direct evidence were presented at trial.

¶84. I also find error with the trial court's rejection of Manning's argument that the DNA

evidence is relevant because the prosecutor's closing argument likely influenced the jury. Although the trial court was right in stating that closing arguments are not considered evidence, the hairs that were found in Miller's car were admitted into evidence, as was testimony from an FBI agent that the hairs belonged to a member of the African-American race, a race to which Manning belongs. The prosecutor then used that evidence in closing arguments to imply that the hairs had come from Manning. Therefore, I would find that the trial court erred by finding Manning's argument to be without merit.

¶85. Moreover, although the trial court found probative the six years that had elapsed between the grant of Manning's motion to test evidence and his request to have the evidence transferred, over which Manning largely had no control, the fact remains that Manning had spent almost twenty years in prison before this Court granted his motion to test the evidence. Any potential harm in waiting an additional three to four months to determine whether MitoTyping Technologies can identify a DNA profile for the hairs found in Miller's car, some of which were introduced at trial as purportedly coming from Manning, is surely minimal considering that Manning has been sentenced to death.

¶86. Because some of the hair samples were directly used to convict Manning, because final testing of the evidence can be completed in a short amount of time, and because the development of a DNA profile has the potential to exonerate Manning, I agree with Manning's contention that the circuit court clearly erred when it determined the ultimate relevance of testing prematurely. Thus, I would grant Manning's motion to transfer evidence for final testing.

**KITCHENS, P.J., JOINS THIS OPINION.**