447 So.2d 113 (1984)
Larry Donnell RUFFIN
v.
STATE of Mississippi.
No. 54071.
Supreme Court of Mississippi.
February 22, 1984.
*114 Ken Rose, Atlanta, Ga., Kennie E. Middleton, Fayette, for appellant.
Bill Allain, Atty. Gen. by Amy D. Whitten, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before BROOM, P.J., and HAWKINS and DAN M. LEE, JJ.
HAWKINS, Justice, for the Court:
Larry Donnell Ruffin was convicted of murder and given a life sentence at a bifurcated trial in Harrison County. A change of venue from Forrest County had been granted due to pre-trial publicity.

FACTS
In the rural community of Eatonville in Forrest County, on May 4, 1979, the residences of Dwayne and Eva Gail Patterson and Charles Smith were approximately 200 feet distance from each other. Dwayne Patterson was employed on an offshore oil rig and not home that day.
Around 10 that evening, as Mrs. Smith and her daughter Michelle Jones were preparing to retire, there was a banging on the door and a ringing of the doorbell. Eva Gail Patterson was at the back of her house, floundering. Her two little children were following her, and the little four-year-old son was screaming: "A Black man tried to hurt my mommy."
Mrs. Patterson died in a pool of her own blood in the carport of the Smith residence. She died from massive blood loss from a seven-inch slash around her throat which severed veins, arteries and the trachea. *115 She had also been stabbed four times in her abdomen. Live spermatozoa were found in her vagina.
Her gown and bedspread contained hairs of Negroid origin.
On May 4 Ruffin was living at the Restitution Center of Forrest County, following a conviction of burglary in March. He was 20 years old. That afternoon he was given a twelve-hour pass, but did not return. He was apprehended May 5, hiding in the bathroom of his girl friend, and was arrested for parole violation, was kept at the jail and not returned to the Restitution Center. Investigation of Ruffin on suspicion of the murder of Mrs. Patterson was begun.
Investigation implicated two other Blacks, Bobby Ray Dixon and Philip Leo Bivens, who were indicted for and pleaded guilty to murder charges, and sentenced to life imprisonment. Both were state witnesses in Ruffin's trial.
After his arrest Ruffin made two separate written confessions to raping and murdering Mrs. Patterson, one on May 30, and the other June 12. On July 3 law enforcement officers at his direction went to the Patterson residence, and Ruffin described how he stood outside the home, how he gained entrance and how he left following the crimes.
On August 2, 1979, he was indicted by the Forrest County Grand Jury for murder of Mrs. Patterson while engaged in the commission of the crime of rape, in violation of § 97-3-19(2)(e) Mississippi Code of 1972, as amended.
In a bifurcated trial Ruffin was found guilty of capital murder, but in the sentencing phase the jury could not agree on the form of punishment.
Further pertinent facts will be set forth under the assignment of error.

SUFFICIENCY OF THE EVIDENCE
No claim is made the circuit judge erred in admitting the confessions into evidence. Rather, it is contended that the confessions are so contradictory, and the testimony of the two accomplices so inconsistent and incredible as to defy belief.
As an appellate Court we must view the evidence offered on behalf of the state in its most favorable light. Young v. State, 425 So.2d 1022 (Miss. 1983); Warn v. State, 349 So.2d 1055 (Miss. 1977); and Carroll v. State, 196 So.2d 878 (Miss. 1967).
The physical facts demonstrate as ghastly a murder as can be envisioned. A harmless young housewife was raped in her home, and her throat slashed from ear-to-ear in the presence of her two little terrified children.
On May 30 Ruffin confessed to standing outside her home, peeping through the windows and door, gaining entrance by the sliding door, and hiding behind some curtains. He further confessed to springing on her and at knife point raping her. After relating the rape, the confession concludes:
... I was afraid the little boy was going to see me and she was hollering that she was going to call the police and the little boy started crying. I told her to shut up and I put my knife on her side and I told her that I would stick it through her ribs if she don't shut up. I took my knife and stuck it round her throat and I meaned to cut her straight down but the knife went round her throat. I got up and she grabbed her throat and then I went to the kitchen and I ran by the little boy and I grabbed a towel that was hanging by the sink and I wiped my knife off with the towel. Then I ran out the back sliding door to my car and I went back to Brooks.
His confession of June 12 is essentially a repetition, concluding as follows:
... I then forced her to get her clothes off, she went to hollowing and just kept on hollowing and I had her down on the bed screwing her and she kept on hollowing and I guess she woke up the little boy he came into the room just about the time I cut the lady I cut her with my pocket knife. I ran into the kitchen and got a towel off the sink and I then run out the door. I then ran down the road toward Brooks and as I got to the soybean *116 field just pass it I throwed the knife into the woods. I took the towel down to Lou Etta Robinson house and washed it out and then put it into the dirty clothes bag at Helen White house which is behind Lou Etta Robinson house. The tennies shoes that I wore belong to my brother Jack Ruffin I had got then and put them on to play ball in. I then wore them up to Brooks and to the lady house and when I came back from the lady house that I cut I pulled the tennies shoes that belong to Jack Ruffin off and put my own tennies shoes back on. My shoes was torn up and had holes in them was why I put on Jacks Ruffin shoes.[1]
As to the confessions, Ruffin claims the first states he borrowed a car while the second states his brother carried him to the Patterson home. Further, it is asserted none of the physical evidence mentioned in the confessions was ever recovered, namely: the knife, towel, tennis shoes, shirt or trousers.
Defense counsel overlooks the consistencies of the confessions and the fact that law enforcement officers testified Ruffin knew the location of the Patterson home, directed them to it, and there explained how he gained entrance to the house. The weight of this evidence was for the jury. While tangible, physical evidence would have been desirable, the fact that none was ever found is also understandable.
The weight and credibility of these confessions, which they had the right to believe were freely and voluntarily given to this most dastardly murder, was for the jury. In Diddlemeyer v. State, 234 So.2d 292 (Miss. 1970), the appellant contended his confession was not worthy of belief. We stated, at page 296:
Appellant contends that his conviction was based upon incredible evidence, that the state failed to meets its burden of proof and that the verdict of the jury is against the overwhelming weight of the evidence and evinces bias, passion and prejudice on the part of the jury. We find no merit in this contention. The evidence on behalf of the state established without question that Harry Bennett met his death as a result of a criminal agency. Appellant's confession, if believed by the jury, constituted ample evidence to establish this criminal agency. Counsel for appellant points out that appellant repudiated his confession and anyone reading the newspaper account of the killing or hearing television and radio reports of the killing could have secured enough information to have made a confession to the crime. It is also pointed out that there are certain discrepancies between the facts establishing the crime and those in appellant's confession. The jury had all these facts before it and the jurors observed the appellant while he was testifying and heard his reasons why he confessed. They determined these issues. Confessions are not conclusive and may be of little weight or of great weight according to the circumstances of the case, however, ordinarily, this is a matter for the jury to determine and not for the court. After a review of the evidence in this case, we cannot agree with appellant's contention that the confession together with the other testimony is contrary to human experience and is inherently incredible.
See also: Norwood v. State, 258 So.2d 756 Miss. (1972); Craft v. State, 380 So.2d 251 (Miss. 1980); McNeal v. State, 405 So.2d 90 (Miss. 1981).
There is ample evidence in the record to support Ruffin's conviction independent of the testimony of Dixon and Bivens.
Dixon's testimony at trial was contradictory. He first testified the three of them went to the Patterson home, both Ruffin and Bivens raped Mrs. Patterson, and Ruffin cut her throat when she would not give *117 him any money. He also testified Bivens stabbed her in the stomach.
Dixon asked to talk to the circuit judge privately, and in chambers informed him that Ruffin and Bivens raped Mrs. Patterson and they cut her throat, and that he told them he could hold it no longer. According to Dixon they told him they were going to get him when they got out, and he was afraid.
At Ruffin's request, a pre-trial videotaped confession of Dixon was played before the jury. On the video tape Dixon stated Ruffin held Mrs. Patterson's hands while Bivens had sex with her, and then Ruffin had sex with her. Also, he said he held her legs while she was raped. On the tape he said Bivens cut her throat.
On direct, cross-examination and video tape, Dixon told that all three went to the Patterson house together, about the little boy hollering, about asking her for money, about her being cut in the stomach as well as around the throat. His marked inconsistency came from precisely who did the slaying, except he did not do it.
On redirect examination Dixon testified at one time Ruffin cut her throat, and another time Ruffin had sex with her. Then, he abruptly changed his testimony, saying he did not see Ruffin on the night of May 4, that he did not go in the house, was not even there, and that he had never seen Mrs. Patterson before.
Bivens, who was apprehended in California, testified the three of them went to Mrs. Patterson's house from Brooks place, forced themselves in, and that Ruffin assisted by Dixon forced her into a room where Ruffin raped her. He further testified Dixon helped Ruffin to rape her. He also testified Mrs. Patterson and the children kept screaming. He said Ruffin cut her throat, and that he did nothing beyond helping the three of them push their way into the house.
Again, at the request of the defense counsel a video tape of Bivens' confession was played before the jury. Contrary to Dixon, Bivens' video tape confession was detailed, telling about the three of them going into the Patterson home, Ruffin demanding money, slapping Mrs. Patterson around, and raping her. A little child was screaming, Mrs. Patterson was screaming and Ruffin started cutting on her. On the video tape he said no one else raped her but Ruffin.
Also, on the video tape he said when the three of them left and went to Etta Robinson house, that Ruffin was "full of blood," and after removing his clothes, "threw them out back." The video tape was made November 1, 1980.
No doubt any jury would have a marked indisposition to accept very much of the testimony of Dixon at face value. Bivens testimony was not filled with the contradictions Dixon's was. The jury had sufficient evidence from the two of them to believe all three of them were in the Patterson home, that Mrs. Patterson was raped and then murdered, and that all three of them in some manner participated. Since Adam and Eve, it is not at all unusual for accomplices in an offense to each blame the other. When a crime is committed, and more than one person is present, the only conclusion which can possibly be drawn is that one or more of them committed the crime, and then each proceeds to blame the other for the actual perpetration of the crime, it is up to a jury to determine which one, or both, were guilty. See Young v. State, supra; Grooms v. State, 357 So.2d 292 (Miss. 1978); Hill v. State, 237 Ga. 794, 229 S.E.2d 737 (1976); and Cochran v. State, 278 So.2d 451 (Miss. 1973).
It was for the jury to evaluate the testimony of the accomplices, accept that part they deemed valid, and reject the other part. See Oates v. State, 421 So.2d 1025 (Miss. 1982); Jones v. State, 381 So.2d 983 (Miss. 1980); Nash v. State, 278 So.2d 779 (Miss. 1973); Alexander v. State, 251 Miss. 847, 171 So.2d 517 (1965); Gathings v. State, 46 So.2d 800 (Miss. 1950); and Duke v. State, 166 So. 919 (Miss. 1936).
Moreover, as we have stated, there was ample evidence, aside from the testimony *118 of either Dixon or Bivens, to sustain Ruffin's conviction.
At trial Ruffin's defense was he was elsewhere when the crime was committed. He produced several witnesses. The weight of this testimony likewise was for the jury.

RIGHT TO REQUIRE STATE TO PAY EXPENSE OF INDEPENDENT EXPERT
At trial, by agreement between defense counsel and the district attorney, it was stipulated the State Crime Laboratory obtained in their investigation on May 5, 1979, blood which was of the same type as Mrs. Patterson's, hairs of Negroid origin on the bedspread and her nightgown, and live spermatazoa in her vagina. (Vol. XIII, pp. 2426-2427). Following this stipulation Joe E. Andrews of the State Laboratory testified to these facts before the jury. There was no cross-examination.
On appeal it is assigned as error that the circuit judge overruled a pre-trial motion to pay the expense of the defense hiring as independent expert from New York to examine blood, hair and fiber samples, as well as "fingerprints".
Prior to trial Ruffin was represented by Percy W. Watson of Hattiesburg, Kennie E. Middleton of Fayette, and Andria I. Young, Millard C. Farmer and Joseph M. Nursey of Atlanta. These attorneys filed a motion on June 6, 1980, to require the state to provide the defendant with reasonable funds to employ experts, and requested the court to conduct an evidentiary hearing to determine what experts were required.
At the evidentiary hearing on June 26, 1980, Nursey testified he had reviewed the samples at the State Laboratory and in his opinion as a criminal lawyer from the Florida and Georgia Bar the defense should have tests made by an independent expert on the pocket knife seized from Ruffin, a knife from the Patterson home, and fingerprints taken from various areas of the Patterson home, as well as the blood, hair and semen samples. He said none of the fingerprints were identified as Ruffin's. He recommended an expert from New York City, and said the cost would be approximately $500.00.
There is no merit in this assignment of error. That there can conceivably be instances when the state in fairness should be required to pay the cost of an expert needed by the defense to insure a fair trial for an indigent accused must be conceded. Those cases can only be left to the discretion of the trial court, and they will be rare. See: U.S. v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1952); U.S. v. Pennsylvania, 452 F.2d 557 (3rd Cir.1971); Aldisert, C.J., p. 563; State v. Grant, 560 S.W.2d 384 (Mo. 1977); Graham v. State, 547 S.W.2d 531 (Tenn. 1977); and State v. Montgomery, 291 N.C. 91, 229 S.E.2d 572 (N.C. 1976).
As aptly stated in Oregon v. Acosta, 41 Or. App. 257, 597 P.2d 1282 (Ore. 1979), p. 1284:
It is apparent that an indigent's statutorily enacted right to defense expenses is not absolute, but is conditioned upon a showing that such expenses are needed to prepare and present an adequate defense. (Citations omitted) Neither the statute nor the constitutional guarantees of effective assistance of counsel and of equal protection require that an investigator or expert be furnished at public expense upon demand. (Citations omitted) There is no single test for determining whether the services of an investigator or an expert are necessary; that decision will depend on the facts and circumstances of the particular case and must be committed to the sound discretion of the court to which the request for expenses is directed. (Citations omitted) [Emphasis added.]
See also, 34 A.L.R.3rd 1256, §§ 7 through 17.
The trouble with appellant's argument in this case is, first, the evidence of which he attempt to complain on appeal was admitted by stipulation and without objection. None of the evidence identified Ruffin.
*119 As for the failure to find Ruffin's fingerprints, as contended by his pre-trial defense counsel, if true, defense counsel had excellent opportunity to ask all investigating officers whether or not Ruffin's fingerprints were found anywhere in or around the Patterson residence.
The claim the defendant needed money for an independent expert to examine these samples from the State Laboratory has a hollow ring. If such examination could have been of any possible benefit to Ruffin, it is inconceivable to this Court that diligent defense counsel would not somehow have raised the small sum necessary for such tests. Diligence and zeal of attorneys in our adversary system are commendable. In this case we must conclude the defense was not nearly as desirous of obtaining facts favorable to the defendant for presentation to the court and jury as to sandbag a trial court into reversible error by getting him to overrule the motion. Barnard v. Henderson, 514 F.2d 744 (5th Cir.1975), and White v. Maggio, 556 F.2d 1352 (5th Cir.1977), the only cases cited by Ruffin in support of this assignment, do not apply. Those cases involved a refusal by a Louisiana state court to permit pre-trial examination of a bullet and of pellets found in the victims by an independent expert employed by the defense. There was no refusal in this case, and the evidence in this case, contrary to those cited, was not vital to the state.

PROPRIETY OF ACCESSORY INSTRUCTION
The circuit judge granted the state the following instruction:
If Larry Donnell Ruffin was present against the will of Eva Gail Patterson on May 4, 1979, in her home, and aided Bobby Ray Dixon or Philip Bivens but did not actually commit the rape or murder of Eva Gail Patterson, he is a principal to the crime and is punishable as such.
In view of the testimony of Dixon and Bivens, an instruction on accessory before the fact in some form was proper in this case. Otherwise, the jury would have been without any guidance on this material point. The instruction given was in the abstract, and should have been more specific. When read with all instructions, however, the jury could not have been misled. The jury was adequately instructed on the elements of murder and rape, and in order to convict Ruffin, it was necessary for the jury to believe one of the three committed the actual murder and the rape, and further that Ruffin, being present, aided in the commission of the offenses.
Newton v. State, 12 So. 560 (Miss. 1893), cited by appellant is distinguishable. The instruction in that case assumed as true an alleged rape, and was condemned for that reason, not because it was in the abstract. In Gilmer v. State, 271 So.2d 738 (Miss. 1973), we distinguished Newton from a case such as this, and further held the mere fact an instruction is abstract is not ground for reversal. This is especially true where, as in this case considering all instructions, the jury was adequately instructed. See: Polk v. State, 417 So.2d 930 (Miss. 1982); Norman v. State, 385 So.2d 1298 (Miss. 1980); Barr v. State, 359 So.2d 334 (Miss. 1978); and Meyer v. State, 309 So.2d 161 (Miss. 1975).
For the reason that, considering all instructions, the jury was adequately instructed, there is not merit the instruction violated any constitutional standard for vagueness.

REFUSAL OF INSTRUCTION REQUESTED BY DEFENDANT
The circuit judge refused instruction D-22 requested by the defendant:
The Court instructs the jury that Larry Ruffin's theory of this case is that Philip Bivens and Bobby Ray Dixon committed the capital murder of Eva Gail Patterson; that Philip Bivens and Bobby Ray Dixon gave statements implicating Larry Ruffin in this crime for the purpose of inducing the prosecutors to allow them to enter guilty pleas to the lesser included crime of murder, which carries a sentence of life in prison, and thereby escape *120 the possibility of receiving a sentence of death for their crime... .
This is assigned as error. By instruction D-2 granted the defendant the jury was instructed that the testimony of Dixon and Bivens was to be "considered and weighed with great care and caution." With this instruction it was proper for defense counsel to argue, as they did, to the jury that the testimony of these two accomplices was unworthy of belief. Instruction D-22 as to Ruffin's "theory of the case" was improper as well as cumulative.

ADMISSION OF PHOTOGRAPHS
There are instances where photographs of the slain victims serve no evidentiary purpose except to horrify the jury. Such a case would be where the defendant admits the slaying and all details, but claims self-defense, or accident, or for some other reason the homicide was justified or excusable. In such case such photographs prove nothing not specifically admitted, or about which there is no question. We have held in numerous cases, however, that the admission of such photographs lies in the sound discretion of the circuit judge. See: Wiley v. State, No. 54,642 (decided January 4, 1984, and not yet reported); Hubbard v. State, 437 So.2d 430 (Miss. 1983); Hill v. State, 432 So.2d 427 (Miss. 1983); Palmer v. State, 427 So.2d 111 (Miss. 1983); and Shearer v. State, 423 So.2d 824 (Miss. 1983).
In this case the photographs had evidentiary value in proving the brutality of the slaying, and were proper evidence. This was a capital murder case involving rape.
There being no reversible error, this case is therefore affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P.JJ., and ROY NOBLE LEE, BOWLING, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
NOTES
[1] "Brooks" mentioned in both confessions is a nearby poolroom where Blacks drank beer and socialized.