# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2023-KA-00038-SCT

*KATHERINE HARRIS a/k/a KATHERINE LYNETTE HARRIS a/k/a KATHERINE LYNNSHAE HARRIS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/31/2022 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM, SR. |
| TRIAL COURT ATTORNEYS: | ANGELA MARIE HUCK |
| | VICTORIA VALENCIA WASHINGTON |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ZAKIA HELEN ANNYCE BUTLER |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | ROBERT R. MORRIS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/20/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. Katherine Harris appeals her conviction for aggravated DUI.

¶2. While driving with a blood-alcohol concentration (BAC) twice the legal limit, Harris crashed into a deputy sheriff and his patrol vehicle. Harris was driving more than sixty miles per hour and did not brake before slamming into the deputy. The deputy was outside his car

assisting other drivers whose vehicles had become disabled from hitting wooden debris on Interstate 269. The deputy sustained severe internal injuries. His right leg was disfigured and mangled. And part of his left leg was severed off, ultimately requiring amputation above the knee.

¶3. Before trial, the State informed Harris it intended to call both the toxicologist who analyzed Harris's blood sample and an accident reconstructionist. In response, Harris asked the court for public funds to hire her own experts. She wanted money for a toxicology expert and an accident reconstructionist to counter the State's evidence that her BAC was 0.161% and that she negligently failed to yield to the officer's parked patrol vehicle.

¶4. Harris asserted her would-be toxicologist would *retest* her blood drawn the night of the accident. But she had never requested that her blood sample be preserved. And by the time she had filed her expert request, her blood sample—after being stored for nine months following testing—had been destroyed according to routine procedure.

¶5. In subsequent motions, Harris made additional requests for expert funding. The judge found the requests were broad and theoretical, and Harris failed to articulate concrete reasons how these proposed independent experts—one of which she did not even name—would specifically assist her defense. In particular, in her final motion, she claimed she had found a new toxicology expert who would provide an expert opinion that her BAC was below the legal limit. But in the judge's view, she had failed to specify *how* this expert would refute evidence about Harris's high BAC. She now appeals, claiming the judge wrongly denied her expert funding requests.

2

¶6.     In Mississippi, the discretion to grant or deny an indigent defendant funds to retain an independent expert lies with the trial court.[1] A defendant is not entitled to expert funds simply because the State has experts. Nor is it enough to request expert funds based on mere "undeveloped assertions that the expert would be beneficial."[2] Instead, defendants must show a substantial need to justify a trial judge's expending public funds on an expert.[3] And a defendant must give "concrete reasons for requiring such assistance[.]"[4] That an independent expert "would have *possibly* been able to refute the State's expert opinions" or be helpful is "insufficient to warrant the requested relief."[5]

¶7.     By the time Harris sought funds for an expert toxicologist, there was no sample for an independent toxicologist to test. And while Harris listed general areas in which a retained toxicologist or accident reconstructionist could *possibly* help, Harris never explained how her own experts would *actually* assist her defense.[6]

¶8.     Furthermore, the State's case in no way relied exclusively on these two experts and her BAC. The State called additional witnesses who established the patrol car was clearly

---

[1] *Eubanks v. State*, 291 So. 3d 309, 315 (Miss. 2020) (citing *Ruffin v. State*, 447 So. 2d 113, 118 (Miss. 1984)).

[2] *Hansen v. State*, 592 So. 2d 114, 125 (Miss. 1991) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)).

[3] *Lowe v. State*, 127 So. 3d 178, 181 (Miss. 2013) (citing *Richardson v. State*, 767 So. 2d 195, 198 (Miss. 2000)).

[4] *Hansen*, 592 So. 2d at 125.

[5] *Eubanks*, 291 So. 3d at 318.

[6] *Id.* at 316.

visible with its blue lights flashing. And multiple other vehicles successfully passed the patrol car before Harris slammed into it. Witnesses also testified Harris smelled like alcohol, failed a field sobriety test, admitted she had been drinking, and tested positive for alcohol on a portable breathalyzer at the scene.

¶9. In sum, we discern no abuse of discretion in the judge's denial of Harris's request for expert funds. Based on the overwhelming evidence supporting Harris's aggravated DUI conviction, the judge's discretionary denial, even if erroneous, was not so prejudicial as to render her trial fundamentally unfair.[7]

¶10. We affirm Harris's conviction and sentence.

## Facts and Procedural History

### I. Harris's Aggravated DUI

¶11. On February 5, 2021, Desoto County Sheriff's Deputy Austin Eldridge responded to a 911 dispatch to clear debris from Interstate 269. A log or wooden pole had fallen into the northbound lane and shattered. And several cars had hit large pieces of wood, flattening tires and disabling vehicles.

¶12. When Deputy Eldridge arrived, he positioned his patrol car in the right lane to block traffic and protect disabled vehicles on the right shoulder. He kept his blue lights flashing. And then he got out of his patrol car to remove the debris from the road and check on stranded drivers. When one driver who had a flat tire said his jack was not working, Deputy Eldrige walked to the back of his patrol car to retrieve his.

---

[7] *Townsend v. State*, 847 So. 2d 825, 829 (Miss. 2003).

¶13.    One of the stranded drivers testified that multiple cars had successfully moved into the left lane and safely passed the patrol car. But when Harris approached, she neither steered her vehicle out of the right lane nor significantly slowed down. In fact, the data from her vehicle showed she did not attempt to turn the wheel or brake. Instead, while Deputy Harris was opening his trunk, Harris's car slammed into him, smashing the deputy into his patrol car. She was driving more than sixty miles per hour, and the impact knocked the parked patrol car more than four hundred feet. It severed Eldridge's legs and sent him flying through the air. Eldridge sustained gruesome, serious injuries, including the amputation of his left leg, permanent damage to his right leg, and the loss of his spleen due to internal bleeding.

¶14.    State Trooper Jonathan Bishop responded to the crash. When he checked on Harris, he immediately smelled alcohol. Trooper Bishop asked Harris if she had been drinking. Initially, she claimed she consumed just one drink thirty minutes earlier. A preliminary breath test confirmed the presence of alcohol. Trooper Bishop then conducted a field sobriety test. Harris stumbled through the walk-and-turn test, exhibiting multiple indicators of intoxication. Trooper Bishop decided against conducting the one-leg-stand test because she had lost her balance badly in the first test.

¶15.    Trooper Bishop arrested Harris. On the way to jail, Harris said she had consumed two drinks before the crash. She expressed remorse for hitting Deputy Eldridge and said she needed to "serve her consequences."

**II.    Harris's Blood Sample**

¶16. Once at the jail, Harris consented in writing to a blood draw. Trooper Bishop watched a trained technician draw her blood and seal it in a vial. The trooper then took possession of the sample. Trooper Bishop testified that he usually transported blood samples straight to the crime lab. But because it was after 10:00 p.m. on a Friday, the crime lab was closed for the weekend. In such instances, Trooper Bishop was trained to freeze the blood to preserve the sample. And that is exactly what he did. He put the blood sample in his freezer. Then, first thing Monday morning, he took the sample to the crime lab.

¶17. David Lockley, toxicologist with the state crime lab, analyzed Harris's blood sample. His analysis revealed Harris's BAC had been 0.161%—two times the legal limit to operate a vehicle. Miss. Code Ann. § 63-11-30(1)(d)(i) (Supp. 2017).

¶18. The State charged Harris with aggravated DUI—operating a vehicle with a BAC of more than 0.08% and, in a negligent manner, causing the mutilation, disfigurement, and/or permanent disability to Deputy Eldridge. Miss. Code Ann. § 63-11-30(5) (Supp. 2017).

### III. Harris's Motions for Expert Funds

¶19. Before trial, Harris requested funds to retain defense experts.

¶20. In her original motion, Harris claimed she needed an independent toxicologist. She listed the name and qualifications of a medical pharmacologist she wanted to retain, Dr. Jimmy Valentine. She asserted that Dr. Valentine would retest her blood sample and assess the State's toxicology report. He would also evaluate the State's accident-reconstruction report and Harris's driving skills.

¶21. The State pointed out Harris's blood could not be retested. As a matter of procedure, the state crime lab keeps collected blood samples for six months. If the defense does not request the blood sample during this time, it is destroyed. The state crime lab actually kept Harris's sample for almost nine months. And in August 2021, the State gave Harris the blood analysis results, indicating its intention to use the report at trial against Harris. Two months later, the State notified Harris the date on which the blood sample would be destroyed. Because Harris did not request the sample, the lab destroyed it in November 2021. Harris did not request expert funds until February 2022.

¶22. The trial court denied Harris's motion. In the court's view, Harris had presented unsubstantiated and vague assertions about why she needed funds to retain an expert. She cited no concrete, specific reasons—especially considering the evidence sought to be tested by an independent toxicologist had already been destroyed. But the trial court assured Harris the State's experts would be made available for pretrial examination.

¶23. Harris renewed her motion for experts funds several times. But each time, the trial court concluded Harris presented no new reasons why the court should reconsider its earlier ruling. In particular, the court questioned the need for a toxicology expert for a nonexistent blood sample. Harris insisted a toxicologist could assist in other ways. The gist of her argument was that, because the State intended to present the toxicology report and accident-reconstruction report, she needed her own expert toxicologist and accident reconstructionist too. But the court found Harris's requests were overly broad and general.

¶24. In Harris's final push for expert funds, she identified a new potential toxicologist, Dr. Matthew Cheney. Harris asserted that Dr. Cheney would refute that her BAC was above 0.08% at the time of the crash. But Harris provided no details about Dr. Cheney's qualifications. Nor did she explain how he would refute the toxicology report. The trial court rejected her renewed motion as still overly broad and based on "theoretical" conclusions.

### IV. The State's Motion in Limine

¶25. The State also filed a pretrial motion. In this in limine motion, the State asked the trial court to "limit or restrict prejudicial comments of counsel opposite at trial." Specifically, the State requested that "unsupported allegations" of evidence tampering, witness tampering, or collusion between law enforcement and the district attorney be prohibited. Citing Mississippi Rule of Criminal Procedure 19.1(a)(3), the State also asked that Harris's counsel be restricted from making "what you won't see" or "what you won't hear" comments in the defense's opening statement.

¶26. The trial court granted the motion in part. The court granted the request to preclude commenting in opening statement about the lack of evidence or witnesses and in the closing arguments about the failure to introduce evidence or call witnesses. But the judge left the door open for Harris to introduce, at trial, evidence of witness tampering or the destruction or concealment of evidence. Before such evidence could be introduced, however, Harris would have to make a motion outside the jury's presence.

### V. Harris's Trial and Conviction

¶27. Harris's trial took place over three days in September 2022. The State called multiple witnesses—including bystanders who witnessed the crash and officers who responded to the 911 call along with Deputy Eldridge. The State also called officers who responded after Deputy Eldridge was struck; the technician who drew Harris's blood; Dr. Lockley, who analyzed Harris's blood; and a highway patrolman who produced an accident-reconstruction report. After deliberating, the jury found Harris guilty of aggravated DUI. The trial court sentenced her to twenty-five years in prison with five years suspended.

¶28. Harris appeals, challenging both the trial court's denial of her motions for expert funds and the partial grant of the State's motion in limine.

## Discussion

### I. Denial of Expert Funds

¶29. Harris first argues the trial court abused its discretion by denying her request for expert funds.

¶30. Citing *Eubanks*, Harris asserts that indigent criminal defendants like herself must be provided the "basic tools of an adequate defense" when they cannot otherwise afford them. *Eubanks*, 291 So. 3d at 316 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985)). Harris suggests experts in toxicology and accident reconstruction were necessary for her to prepare her defense, properly cross-examine and rebut the State's witnesses, and testify in support of her defense theory.

¶31. But Harris was not entitled to expert funds simply because she requested them. *Johnson v. State*, 476 So. 2d 1195, 1202-03 (Miss. 1985). As Harris acknowledges on

9

appeal, "[a]n indigent's right to defense expenses is 'conditioned upon a showing that such expenses are needed to prepare and present an adequate defense.'" *Eubanks*, 291 So. 3d at 316 (quoting *Green v. State*, 631 So. 2d 167, 171 (Miss. 1994)). Indeed, an indigent defendant seeking expert assistance must "offer concrete reasons for requiring such assistance, not 'undeveloped assertions that the requested assistance would be beneficial.'" *Id.* (quoting *Hansen*, 592 So. 2d at 125). And here, the trial court found that instead of offering concrete reasons for needing experts, Harris instead made overly broad and theoretical assertions about why expert assistance would be helpful.

¶32. Whether to grant a request for expert funds is a discretionary call left to the trial court. *Id.* (citing *Ruffin*, 447 So. 2d at 118). And this Court weighs on a case-by-case basis whether the denial of expert assistance was prejudicial to the defendant. *Johnson v. State*, 529 So. 2d 577, 590 (Miss. 1998). Only when the defendant shows the trial court's abuse of discretion was so egregious that it denied her due process and a fair trial will this Court offer relief on appeal. *Id.* Considering this broad discretionary call, we do not find that under the circumstances the trial court reversibly erred by denying Harris's request for funds to retain experts in toxicology and accident reconstruction.

### A. Accident Reconstructionist

¶33. First, as to her request for accident-reconstructionist funds, we agree with the trial court that Harris's claimed need was undeveloped and unsupported. *Eubanks*, 291 So. 3d at 316. Harris broadly asserted that she needed a separate accident-reconstruction expert. But she did not disclose who that expert might be. Nor did she provide concrete ways in

10

which this unnamed expert would assist her counsel. Instead, her argument essentially boiled down to her insistence she should get an expert because the State had one.

¶34. Of course, "what extent the State's case depends upon the State's experts" weighs into whether the denial of expert funds was fundamentally unfair. *Townsend*, 847 So. 2d at 829 (citing *Tubbs v. State*, 402 So. 2d 830, 836 (Miss. 1981)). And here, contrary to Harris's assertion, the State *did not* solely rely on the accident-reconstruction report to prove Harris negligently operated her vehicle when she struck Deputy Eldridge. The State also presented multiple eyewitnesses. One witness was another officer who had responded to the 911 dispatch. He testified that Deputy Eldridge's patrol car was clearly visible with its blue flashing lights. Another witness was a bystander to the crash. He observed that just prior to Harris slamming into the patrol car without braking or swerving, multiple vehicles had successfully merged into the left lane and safely avoiding the patrol car in the right lane. So even absent the accident-reconstruction report, ample evidence supported that Harris drove in a negligent manner. *See id.* (concluding that "an expert would have been of little assistance to Townsend because the evidence against him, irrespective of that testified to by experts, was overwhelming"). Moreover, contrary to Harris's assertion, her lawyer thoroughly cross-examined the officer who compiled the accident-reconstruction report. *Eubanks*, 291 So. 3d at 318 (finding no abuse of discretion by denying expert funds when the "the record show[ed] that defense counsel, without the requested expert assistance, thoroughly cross-examined the experts").

¶35. Given the vagueness of her request for an accident reconstructionist, the overwhelming evidence against Harris, and the thoroughness of her cross-examination of the State's expert, the trial judge did not violate Harris's due-process rights by denying her funds for an accident reconstructionist.

### B. Toxicologist

¶36. As to her request for an expert toxicologist, Harris is right that the State relied on the toxicology report to prove an essential element of aggravated DUI—namely, that her BAC was 0.161%, twice the legal limit. Harris likens her case to *Lowe*, 127 So. 3d 178. In *Lowe*, this Court held that "the circuit court deprived Lowe of a fundamentally fair trial by denying him the assistance of a computer forensics expert when the State relied exclusively on its own expert to identify Lowe as the perpetrator of the offenses charged." *Id.* at 181.

¶37. But a key distinction exists between this case and *Lowe*.

¶38. Lowe was a child-exploitation case based on child pornography downloaded onto a laptop. *Id.* at 179. And the computer hard drive was still available for independent forensic cyber-analysis when Lowe requested expert funds. *Id.* at 181. Here, in sharp contrast, by the time Harris requested funds for a toxicologist, her blood sample had already been destroyed. And it was destroyed only after it had been retained for almost nine months without any request by Harris to preserve or reanalyze it. Thus, while Harris claimed the need for an independent expert to retest her blood, there was no blood to retest or analyze. And the *futility* of her request for funds to hire an expert toxicologist served as a driving factor in the trial judge's denying her request.

¶39.   In subsequent motions, Harris insisted she still needed an expert to refute the toxicology report.  But in *Eubanks*, this Court held an assertion that an independent expert "would have *possibly* been able to refute the State's expert opinions" or be beneficial was "insufficient to warrant the requested relief." *Eubanks*, 291 So. 3d at 318.  The same is true here.  Harris failed to articulate how an expert could *possibly* refute the finding she had a BAC of 0.161% after the blood sample had already been destroyed.  Because she articulated no concrete reasons how an independent toxicologist would be helpful, the trial judge did not abuse his discretion by not reconsidering his decision to deny expert funds.

¶40.   This is especially so given that Harris cannot show how she was prejudiced by not having an expert.  First, just as in *Eubanks*, the record showed Harris's counsel, without the assistance of experts, thoroughly cross-examined the State toxicologist, Dr. Lockley. *Id.* Counsel vigorously attacked the chain of custody of the blood sample and the impact of freezing it for two days before delivering it to the state crime lab.  And, second, while this was a DUI *per se* case based on BAC, the State presented ample additional evidence, besides Harris's BAC, to show Harris was driving while intoxicated. *Townsend*, 847 So. 2d at 829. Multiple witnesses testified that Harris smelled of alcohol, failed a field sobriety test, did not brake or slow down when approaching the patrol car and hitting the deputy, and admitted that night she had been drinking.  For example, Deputy Jonathan Hendrix who was aiding in the log removal when the crash occured testified that Harris spoke incoherently and "had an odor of alcohol about her."  Trooper Bishop, who arrived after the crash, also testified that Harris

smelled of alcohol, admitted she had been drinking, failed a preliminary breath test, and stumbled through the field sobriety test.

¶41.    For these reasons, the trial court did not abuse its discretion when it denied Harris's expert funds requests.

## II.    Partial Grant of Motion in Limine

¶42.    Harris's other appellate claim is that the partial grant of the State's motion in limine unfairly limited her defense.

¶43.    Motions in limine involve the pretrial admission or exclusion of evidence. *Wells v. State*, 233 So. 3d 279, 284 (Miss. 2017).  And this Court leaves the admission and exclusion of evidence to the trial court's discretion. *Id.*

¶44.    As an initial matter, we disfavor the trial court's broad order restricting any reference to certain defense theories during opening statements and closing arguments. "[T]he purpose of an opening statement is to inform the jury what a party to the litigation expects the proof to show." *Crenshaw v. State*, 513 So. 2d 898, 900 (Miss. 1987).  And attorneys have wide latitude in arguing their cases to juries—this notion applies to both closing arguments and opening statements. *Hutto v. State*, 227 So. 3d 963, 986 (Miss. 2017) (citing *Dycus v. State*, 875 So. 2d 140, 170 (Miss. 2004), *sentence vacated by Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)).  Further, "[b]efore granting a motion in limine, courts must be certain that such action will not unduly restrict opposing party's presentation of its case." *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988)).  Instead, "[m]otions *in limine* should be granted only in situations where 'the material or evidence in

question will be inadmissible at a trial under the rules of evidence' and the 'mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury.'" **Wells**, 233 So. 3d at 284 (quoting **Evans v. State**, 25 So. 3d 1054, 1057 (Miss. 2010)).

¶45. Here, the trial court's order specifically *reserved* until trial any rulings on the admissibility of the evidence mentioned in the order until a motion was made at trial. So the portion of the order limiting certain topics in opening statements was premature. The better course would have been to allow wider latitude to both Harris and the State in their openings and closing arguments. Any concerns could have been addressed through objections to improper comments as they arose.

¶46. That said, here, we find no reversible error. "Arguments made by counsel during opening statements do not constitute evidence." **Keller v. State**, 138 So. 3d 817, 861 (Miss. 2014) (citing **Goff v. State**, 14 So. 3d 625, 652 (Miss. 2009); **Crenshaw**, 513 So. 2d at 900). And the trial judge instructed the jury that counsel's statements and arguments are not evidence. Harris cannot point to any evidence the court restricted her from introducing or any line of questioning she was forbidden to broach. Nor does she, for that matter, proffer any arguments she would have made in closing but for the order.

¶47. She asserts the order essentially limited her attorney's ability to question and perhaps discredit Trooper Bishop about circumstances surrounding his taking Harris's blood sample and storing it in a freezer. But the trial court's order did not categorically prohibit questioning or commenting on officer misconduct or mishandling of evidence. It simply

15

directed the parties, before delving into such topics, to approach the court outside the jury's presence. And on appeal, Harris points to no such motions the court denied. Nor does she cite any questions she tried to ask but was precluded from doing so.

¶48.    In fact, the record shows the court allowed Harris's counsel to methodically question Trooper Bishop about methods he used to test Harris's sobriety. And counsel pointed out inconsistencies in Trooper Bishop's crash report and what he supposedly saw at the scene. Notably, Harris examined Trooper Bishop—over the State's objection—about potential issues with the blood sample. Specifically, Harris highlighted that Trooper Bishop retained the blood in a freezer with no positive proof other than his testimony to show that the sample in fact remained in the freezer the entire weekend.

¶49.    So contrary to Harris's appellate assertions, she did present her theory of defense. Because Harris cannot show she her defense was improperly hampered by the trial court's order, we affirm.

¶50.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**